OPINION OF THE COURT
Stan L. Pritzker, J.
*747 This case involves a severe child abuse and neglect petition filed by the Washington County Department of Social Services (hereinafter petitioner or DSS) against mother (hereinafter respondent or mother).
Summary of the Testimony
1. Michelle Patch: Ms. Patch is a senior caseworker with the DSS. She was the on-call worker when the CPS report was issued, on Saturday, February 2, 2008. The initial report indicated that the child was vomiting and had two dime-sized bruises beneath her clavicles. There were also concerns about the child’s reaction to some injections which were administered on Wednesday, January 30, 2008. After receiving the report, on February 2, 2008, Ms. Patch contacted the source and commenced a joint investigation with the Washington County Sheriff’s Department. Ms. Patch drove to Glens Falls Hospital at about 2:00 p.m. on February 2 and interviewed the emergency room physician (Dr. Poonthota) and the mother. She obtained a general time line and family history. It was noted that the mother, a 17-year-old high school student, resided with her father and his fiancée. It was also noted that while pregnant with the child and living in Florida at the time, mother was assaulted by her birth parent. The child’s medical history included a large cranium and an acid reflux condition.
The time line obtained from the mother revealed that mother brought the child for shots on Wednesday. That night, the child became fussy, vomited, and may have had a seizure. The next morning (Thursday), when the mother left for high school, her boyfriend picked up the child. That morning, the mother called the boyfriend to check on the child. It is unclear exactly what boyfriend reported. Ms. Patch indicated that he reported that the child had undergone seizure-like activity. The characterization of the child’s symptoms was contested. In any case, it is clear that despite the symptoms, neither mother nor boyfriend sought medical care for the two-month-old child at this point.
The next day (Friday) was a snow day and mother did not have school, but had a job interview at Glens Falls Hospital. Her father drove she and the child to the interview. The child stayed in the car with grandfather for about 45 minutes, while mother was interviewed. Grandfather was not called to testify. After the interview, the mother returned to her boyfriend’s home with the child. Later, mother and boyfriend left for the evening to go to the fire department where boyfriend volun *748 teered. his services. The child remained with boyfriend’s parents. They returned to boyfriend’s home at 10:30 p.m. At that time, they noticed that the child began projectile vomiting and had seizure-like episodes. Boyfriend and mother woke boyfriend’s mother and brought child to the Glens Falls Hospital emergency room. This belated action was taken at least two days after the initial symptoms.
Thereafter, at about 5:00 a.m. on February 2, 2008, the child was rushed to Albany Medical Center to undergo tests. The tests revealed: (1) retinal hemorrhaging; (2) two subdural hematoma; and (3) two healing rib fractures. The mother failed to furnish an explanation for the injuries. Ms. Patch also testified that, while at the hospital, the mother generally registered a flat affect, although she did cry when she consented to place the child with DSS.
Boyfriend was also interviewed by Ms. Patch. He indicated that as early as Tuesday, January 29, 2008, the child exhibited strange behavior and may have been constipated. (Transcript at 47.)[1]
On cross-examination by the child’s counsel, Ms. Patch reiterated that the mother showed little emotion, even after “shaken baby syndrome” was mentioned. On cross-examination by the mother’s counsel, Ms. Patch indicated that she believed that the acts by the perpetrator against the child occurred between January 29 and February 1. Ms. Patch conceded that during this period, the child had been with people other than mother. These people included boyfriend, his mother, grandfather, boyfriend’s sisters and one of the sister’s boyfriend. Ms. Patch indicated that they had all been interviewed. Counsel for boyfriend also cross-examined Ms. Patch.
After review, the court found Ms. Patch to be a credible witness who conducted a thorough investigation.
2. Bruce Hamilton: Mr. Hamilton testified that he has been an investigator with the Washington County Sheriffs Department for the past 10 years. During the course of his employment, he was contacted to begin an investigation of this matter. After the call, he went to the Glens Falls Hospital to meet with Ms. Patch. There, he also spoke with the treating physician and then interviewed the mother. Shortly after speaking with her, however, they were all advised that the baby was being transferred to Albany Medical Center.
*749 Investigator Hamilton traveled to Albany Medical Center to continue his interview with mother. Investigator Hamilton spoke to her about the events that transpired on the few days previous. Specifically, mother told Investigator Hamilton that the baby had gotten shots and was very fussy on the evening of January 30th, into the early morning hours of the 31st. She said she got home on January 30th at approximately 6:30 p.m. She said she cared for the child, fed her, cleaned her up and again attempted to feed her at about 11:00 p.m. She also said she gave her Tylenol at that time. Mother said that the baby did not go to sleep until 1:00 a.m. At 3:15 a.m., mother said she was awoken by the baby. At that time, she said she again changed her and fed her but the baby would not go back to sleep until 5:00 a.m. Interestingly, during this time in the early morning hours, she said she called her boyfriend to tell him how fussy the baby was that night. According to the mother, the baby vomited but it is vague as to whether the child had a seizure that night or “shaking episodes.” Notwithstanding, it is clear that neither she nor her boyfriend took the child for medical attention. She offered no explanation to Investigator Hamilton as for her reasons not to seek medical attention despite being asked.
Investigator Hamilton asked her if she caused the baby’s injuries but she denied it. She offered no explanation on how the injuries could have been caused or who could have caused them. She only said that besides her and her boyfriend, the baby was left alone with her father in a car in the Glens Falls Hospital parking lot for about two hours in the afternoon of February 1st while she had an interview thereat. Investigator Hamilton described mother’s affect throughout the interview at the Albany Medical Center as “flat and unemotional.”
While at the hospital, Investigator Hamilton also took photographs of the child. Of note were two identically shaped bruises on her chest near her armpits. While at the hospital, Investigator Hamilton asked grandfather if he had ever seen these marks on the child. Grandfather said he saw mother “a day or so” earlier giving the child a bath. At that time, he said he did not notice any of these marks on the child’s body.
The witness’ testimony was credible.
3. Dr. John Waldman: Dr. Waldman testified that he is a professor of neurosurgery and an attending neurosurgeon at the Albany Medical Center Hospital. He had been employed thereat for approximately 30 years. He is board certified in neurosur *750 gery and pediatric neurosurgery. Dr. Waldman first saw the child on February 4, 2008 at the hospital. His initial observations included a review of her CT scan that was done on February 2, 2008. It was his opinion that the baby had suffered bilateral subdural hematomas, a collection of bloody fluid present in the subdural space, located underneath the dura, a thick membrane that is right underneath the skull and the brain. The effects of subdural hematoma can cause death. Accordingly, a series of subdural taps (the injection of a needle through the baby’s skin into the subdural space) were performed to drain the fluid from that area. Unfortunately, the baby’s head size continued to increase, indicating that the taps were unsuccessful.
The baby was then brought to the operating room and underwent another surgical procedure called a bilateral craniotomy, opening the bones in the baby’s cranium, opening the dura and draining the fluid out. It was Dr. Waldman’s professional opinion that without medical intervention, there was a reasonable chance she would have died.
On cross-examination, Dr. Waldman testified that an ultrasound performed on the baby’s head on January 19, 2008 (due to the baby’s increased head size) showed that the injuries presented on February 2, 2008 were not present in the earlier ultrasound. Dr. Waldman also discounted theories that the respondent presented that may have caused these acute injuries. Specifically, the injuries could not have come from the child straining from constipation or any other gradual strain.
The witness’ testimony was credible and probative.
4. Marianne Allen: Ms. Allen testified that she has been a registered pediatric nurse practitioner since 1978. She was with the attending pediatrician at the child’s birth. She had contact with the baby and her mother throughout the course of the child’s life when mother would bring her in for routine checkups. Ms. Allen opined that she believed that the child was a normally developing baby but had some problems with acid reflux. She also testified that at about six weeks, the child’s head size had jumped from approximately the 75% range to the 95% range. An ultrasound was scheduled and completed, showing no abnormalities.
Ms. Allen again saw the child on the morning of January 30, 2008 for a “well baby” visit at the office. This visit was significant to Ms. Allen as it was the child’s most significant weight gain yet and it showed to her that her acid reflux was being *751 treated properly. The “examination was perfectly normal” (transcript at 218). At that visit, the child also received her vaccination shots. Fortuitously, the visit was also highly significant in establishing the likely time line for the injury. Ms. Allen, a highly trained nurse who was quite familiar with the child, observed nothing wrong with the child on the morning of January 30, 2008 (cf. Matter of Seamus K., 33 AD3d 1030, 1036 [3d Dept 2006, Crew III, J., concurring in part, dissenting in part] [in contrast to the case at bar, in Matter of Seamus K. no medically trained observer witnessed child as appearing healthy in such close proximity to injury]). Ms. Allen also commented that respondent visited often and had questions about the child’s health. “I don’t think [they] could have come in any more than they did, Sir.” (Transcript at 235.) Ms. Allen did not see the child again until after her visit to Albany Medical Center.
On cross-examination, Ms. Allen testified that the child may have, during her visits, been experiencing constipation from formula intolerance or formula problems. When asked if this constipation could have been to such an extent as to cause retinal hemorrhaging, she replied, “no, clearly no.” (Transcript at 226.)
Ms. Allen’s testimony was credible and highly probative.
5. Raymond Walsh, M.D.: Dr. Walsh is an attending physician in the pediatric intensive care unit at Albany Medical Center. Dr. Walsh first met the child on the morning of February 3, 2008. His initial examination of her revealed that she was lethargic and irritable. He noted that the baby’s fontanel on her head was bulging, indicating intracranial pressure. Such pressure, he testified, could cause the child to lapse into a deep coma and eventually die. He also noted, upon further examination and review of all relevant records, that the child had fractures to two ribs on her left side. He explained that infants’ rib cages are “fairly elastic” so that it takes force greater than that exerted during cardiopulmonary resuscitation with chest compressions to break a rib. These fractures were in the process of healing and that with infants, such calcification begins within a week of the trauma which caused the fracture and that based upon his review of the X rays, he felt that these fractures were less than a week old. Specifically, he testified that he felt that these fractures were from an injury within “two to four days” earlier. (Transcript at 283.) On cross-examination, he conceded, however, that the fracture could have occurred as much as a week earlier.
*752 Dr. Walsh also noted retinal hemorrhages in both of the child’s eyes. Dr. Walsh testified that the medical diagnosis that encompasses all of these injuries is “shaken baby syndrome,” a situation where an infant is shaken so hard that is causes the baby’s head to move back and forth on the neck so violently it would simulate being in a car crash at “around 35 to 40 miles per hour.” Dr. Walsh discounted any possibility that this baby could have suffered these injuries while in útero.
Dr. Walsh’s testimony was credible.
6. Mark Hite, M.D.: Dr. Hite testified that he is board certified in ophthalmology, having been president of Glens Falls Eye Associates for over 15 years. Dr. Hite performed a retinal examination of the child when she was admitted to the Glens Falls Hospital on February 2, 2008. The examination revealed numerous retinal hemorrhages in both eyes. He testified that these injuries were consistent with the diagnosis of “shaken baby syndrome.” He said that such injuries were serious in that they showed that the retina had been deprived of oxygen which could have resulted in blindness. Just as importantly, Dr. Hite described the hemorrhages that he saw in the child’s retinas on February 2, 2008 as “very recent” meaning “less than a week” old and when he again saw her on February 28, 2008, he described the hemorrhages as “resolving” (transcript at 312).
The testimony was largely unimpeached.
7. Anjana Poonthota, M.D.: Dr. Poonthota testified next. She is a doctor of pediatrics, employed by the Hudson Headwaters Health Network. She also has hospital privileges at Glens Falls Hospital and was working thereat in the early morning hours of February 2, 2008 when she first became familiar with the child by treating her that morning. At that time, the child was brought to the emergency room by her mother and her mother’s boyfriend. Initially, she was told the baby was brought to the emergency room because of reflux. Upon further questioning, Dr. Poonthota was told that the baby had “shaking episodes” and “unresponsive episodes” which lasted, at a maximum duration, an hour, which caused her concern. The baby also presented with “dime sized bruises on both the sides above the nipples.” (Transcript at 325.) She thought, based upon the coloring, that the bruises were from an injury within the “past two or three days.” (Transcript at 331.) Dr. Poonthota asked mother if she knew how the bruises occurred and mother said that the child has “shaken episodes” and that the “bruises come and go” (transcript at 331), an event the doctor had never heard of *753 before. Dr. Poonthota testified that her physical findings were “incompatible” with the history given to her by the baby’s mother. After concluding her examination, Dr. Poonthota diagnosed the child with having “shaken baby syndrome” as well.
8. Renee Kobor: Ms. Kobor testified that she is a certified foster parent who first became aware of the child on February 12, 2008, when she came into her care. Since then, she had been taking care of the child. She had brought her to all of her doctors’ visits as well as early intervention services, including both occupational and physical therapy. The child was presently “lagging about six months behind” normal development. Ms. Kobor testified that she brings the child to these appointments once a week but that mother had never asked her about the child’s medical progress. (Transcript, vol 2, at 12.)
The testimony was credible.
9. Amy Solan: Ms. Solan is the physical therapist who had been working, and continues to work with the child twice a week, since March 26, 2008. Ms. Solan testified that, based upon her experience, it was her opinion that the child’s gross motor skills were roughly five months delayed.
The testimony was credible.
10. Paula Gardner: Ms. Gardner is employed as a pediatric occupational therapist and had been so employed, at the time of this hearing, for five years. She had been working and continues to work with the child, since May 2008, when the child was five months old. She testified that when she started working with her, the child’s fine motor skills were delayed approximately four months. Despite working with the child on a weekly basis for approximately seven months (at the time of the hearing), Ms. Gardner testified that mother had never attended any of the occupational therapy visits nor inquired about the child’s progress.
The testimony was credible.
11. Terry Leary: Ms. Leary is employed by the Washington County Early Head Start Program as an infant teacher and had been so employed, at the time of the hearing, for 15 years. She met the child while her mother was attending BOCES at their facility and Ms. Leary watched the child on three of those days. Specifically, Ms. Leary watched the child on January 11, January 16 and January 28, 2008 in a room that, based upon the way their classroom is set up, always had at least two adults *754 present. Ms. Leary said that she had little contact with the child, but did speak with mother on February 4, 2008. Mother, at that time, said that the child was in the hospital and unable to see her. Mother explained that the child had bleeding on her brain and that “when she was pregnant for the child that she was assaulted . . . and so she thought possibly something happened then.” (Transcript, vol 2, at 60.)
The testimony was credible.
12. Ramona Bourne: Ms. Bourne, at the time of the hearing, worked as an aide for Washington County Early Head Start Program. She came in contact with the child, who attended their day care, on January 11, 16 and 28, 2008, respectively. She testified that while the child was in their care, she was always in the presence of at least two adults. Moreover, mother was attending cosmetology class right across the hall.
The testimony was credible.
13. Margaret Lennox: Ms. Lennox is also employed by Washington County Early Head Start Program. In that regard, mother became known to her when mother enrolled in their program, as a pregnant teenager, in November 2007, one day before the child was born. As part of mother’s enrollment, she filled out a form which asked if there had been any complications with the pregnancy. Her only response was that mother had high blood pressure. There was no mention that mother was assaulted, during her pregnancy, by her mother. The form also asked for mother to list who could pick up the child in case of an emergency. Despite the alleged assault, mother listed her mother, among others. Mother never mentioned that there was an order of protection prohibiting her mother from having any contact with her.
The testimony was credible and probative.
14. Sandra Mahoney: Ms. Mahoney was, at the time of the hearing, employed by the Fort Edward School District and also as an emergency medical services supervisor at the Glens Falls Civic Center. On the evening of January 30, 2008, she was working at the Civic Center with the boyfriend. The boyfriend worked there that night from 6:15 p.m. until 9:30 p.m. Ms. Ma-honey also saw mother there that night with the child. During the show at the Civic Center, Ms. Mahoney spoke with mother. Ms. Mahoney noticed that the child was still in her snowsuit in the car seat she was sitting in. Ms. Mahoney thought that it was too warm to be in a snowsuit and car seat and said, “let’s
*755 unbundle her.” (Transcript, vol 2, at 113.) According to the witness, the baby appeared to her to be “quite lethargic for a baby that had just gotten shots.”
The testimony was credible.
15. Boyfriend: Boyfriend testified that he is 19 years old and, at the time of the hearing, had been seeing mother sporadically since September 2007. Their most recent breakup was in late September 2008. They started dating each other again approximately one month later. Boyfriend, from the time the child was born, would act as a babysitter for her most days of the week. He said that on January 29th, he watched the child during the day until he picked mother up from school and brought them back to his house. During that day, he said that the child was a bit fussy but was not unresponsive. He said that the statement he had given earlier about her being unresponsive that day was a miscommunication between him and the Investigator. What he meant was that the child was constipated and seemed to be “zoned” in her efforts to have a bowel movement. (Transcript, vol 2, at 146.) Between 6:00 and 6:30 that night, boyfriend dropped mother and child off at mother’s father’s house, where he and his fiancée resided.
The following morning (Wednesday, January 30, 2008), boyfriend picked the child up from mother’s father’s house at approximately 7:00 a.m. He then left for work at approximately 9:00 a.m. After he left, his mother watched the child. He then returned home from work at about 12:45 p.m. and observed the child to be “fine.” (Transcript, vol 2, at 156.) In the afternoon, he again picked mother up from school and then took both of them to the doctor’s office at approximately 3:00 p.m. at which time the child had an appointment. During the appointment, the child got two shots in each leg. After the doctor’s appointment, they went to Rite-Aid to purchase Children’s Tylenol.
Boyfriend returned to work that evening at approximately 6:00 p.m. He brought mother and the child with him until mother’s dad picked them up and brought them back to his home at about 8:30 p.m. He said he next spoke with mother when he received a call from her “somewhere before three in the morning” (transcript, vol 2, at 160). He said that mother called him from her dad’s house to tell him that the child wasn’t sleeping. He could hear the child in the background. Mother also told him that the child had a fever.
That morning, boyfriend picked up the child from mother’s father’s house at around 6:00 a.m. He brought her to his house *756 where his mother watched her for approximately a half hour so that he could go to an interview at the Glens Falls Hospital. He testified that other than that half-hour period, either he or mother were with the child from the time that he picked mother up from school on the 30th through the entire day of the 31st. He further testified that when he got back home from the interview, the child appeared fine. In the afternoon, he picked mother up from school and dropped her and the child back off at mother’s father’s house.
The following day (February 1st) was a “snow day” and mother did not have to go to school. Mother and the child were driven to boyfriend’s family’s house later in the afternoon of the 1st. Throughout that day, boyfriend had to respond to some EMT calls but the child stayed at the home with mother. That evening, all three of them attended a function at the local firehouse. They returned to boyfriend’s house and put the child to bed at approximately 10:30 p.m. After 11:00 p.m., the child became ill, projectile vomiting “a lot more than usual” (transcript, vol 2, at 179). Mother went to get boyfriend’s mother and then they all went to the hospital.
While the witness was credible, the court was left with the impression that he was holding back relevant information.
16. Mother: Mother testified that she is no longer living with her father but rather, resides in Chestertown in Warren County as of August 2008. She is the mother of the child, who she said was a full-term baby but for five days. She testified that while the child was in útero, she was assaulted by her mother while she was visiting her in Florida in October 2007. She was advised by the Florida doctors that everything was fine, however. The child was born in November 2007. At the time of the child’s birth, mother was dating boyfriend, who was not the child’s biological father. She said that the child suffered from constipation and was also diagnosed with having reflux on January 14, 2008. Mother also was told that the child had a large head, which caused her doctor’s to be concerned. An ultrasound was ordered and completed on January 19, 2008.
Mother stated that the week of January 28, 2008 through February 2, 2008 was “Regents week,” which meant that boyfriend would pick the child up from her house at 8:00 a.m. from a usual pick up time of 6:00 a.m. After her BOCES classes, boyfriend would pick her up and bring her back to his house, where she would stay until approximately 5:45 p.m., except on Wednesdays, which would be “around 9 o’clock” (transcript, vol *757 2, at 218). She said that her father would pick her up from boyfriend’s house with the child and they would all return to his house. The child’s normal bedtime was around 9:30 p.m. to 10:30 p.m. She said that the child would sometimes sleep throughout the entire night and sometimes she would wake a couple of times. If she needed help throughout the night with the child, she testified that her father would help her. On January 29th, she testified that the above was the routine she followed for that day as well. She said that she did not get a lot of sleep the evening of the 29th into the 30th because the child woke up around 1:15 a.m. for about 45 minutes.
On the 30th, mother said she got up and went to school. After school, boyfriend picked her up and both his mother and the child were in the car. From there, they dropped his mother off at her house and went to the doctor’s office, where the child had two shots in each leg. From there, they went back to boyfriend’s house. They left the house for a little while to go to Rite-Aid to pick up Children’s Tylenol.
That evening, mother, boyfriend and the child all attended the Sesame Street show at the Glens Falls Civic Center. From there, she said that her father picked her up at the Civic Center at approximately 8:45 p.m. In the statement that she gave to Investigator Hamilton, however, mother never mentioned going to the Civic Center that evening with the child. Regardless, she said that she arrived home at about 9:15 p.m. with the child. She said that she put the child to bed after feeding her about 9:30 p.m. and again at 11:00 p.m. Again, her testimony was different from the sworn statement she gave to the investigator, which indicated that she only fed the child once that evening. She said the child was irritable from her shots but that she took her temperature at 11:00 p.m. and it was normal. She said she again checked her temperature at 1:00 a.m. when the child awoke and it had changed. She said the child was fussy from 1:00 a.m. until almost 4:00 a.m. (transcript, vol 2, at 233). So fussy, in fact, that she called boyfriend at his house to tell him so. (Again, however, in the statement she gave to police while at the hospital, she said that the child got up at 1:00 a.m. and then again at 3:00 a.m.) Interestingly, there is no testimony that she sought the help of her father, a medical doctor. She does recall only getting a couple of hours sleep that night, though.
On January 31st, boyfriend picked up the child at approximately 6:00 a.m. and mother went to school that day. While at school that very morning, she said she called boyfriend to *758 check on the child’s status. Boyfriend told her that the child was being “unresponsive” (transcript, vol 2, at 242). After speaking to boyfriend, mother said she spoke with Ramona Bourne at the school and told her what boyfriend had told her about the child’s condition. Ms. Bourne told mother that she should take the child to the doctor given the fact that the child was “staring off into space” and “going limp” (transcript, vol 2, at 245). Despite this advice, mother returned home from school and did not take the child to the doctor’s office. She said she did call the doctor’s office at approximately 4:00 p.m. from her home but got no answer and didn’t take the child there because “I end up waiting there for hours and I didn’t have the time” (transcript, vol 2, at 247).
The next day, Friday, February 1, 2008, was also a “snow day” and boyfriend did not pick the child up in the morning and so, the child spent the entire morning with mother, except for about an hour and a half that the child spent with mother’s father in the parking lot of the Glens Falls Hospital while mother had a job interview thereat. That night, the child began projectile vomiting and was taken to the emergency room in the early morning of February 2nd. Mother was advised that the doctor believed the child had suffered from “shaken baby syndrome.” Mother offered no explanation on how or when this could have occurred (transcript, vol 2, at 266), except that she now believes that the child suffered from “whiplash on Christmas” when her “mom’s ex-fiance’s niece” was holding her and the child’s head snapped back. (Transcript, vol 2, at 267, 269-270.) She said that she reported this incident to the doctor’s office but there are no records from any of the doctor’s offices that support this claim.
Since being informed of the “shaken baby syndrome” diagnosis, mother testified that she had not discussed it with the doctors but that she looked it up herself and found out that “the retina hemorrhaging can be from straining while trying to go to the bathroom. It can happen by itself.” (Transcript, vol 2, at 266.)
In general, the court did not find mother’s testimony credible on several key issues, including the events of January 30th.
Discussion and Holdings
A. Standards of Proof: There are two distinct standards of proof applicable in the case at bar. The definitions of these standards provide the foundation and context of the evidentiary *759 analysis that follows. The standard neglect cause of action and the standard abuse cause of action require the petitioner to prove its case by a “preponderance of [the] evidence.” (Family Ct Act § 1046 [b] [i].) A “preponderance [of the evidence] means the greater part of the evidence.” (PJI 1:60 [2009].) The evidence that supports the claim, “must . . . more nearly representí ] what happened than the evidence opposed to it.” (Id.) This standard has been described as a burden of persuading the trier of fact that the existence of the fact is more probable than its nonexistence. (In re Winship, 397 US 358, 370 [1970, Harlan, J., concurring]; see also Prince, Richardson on Evidence § 3-206 [Farrell 11th ed].)
By contrast, the severe abuse claim requires that quality of proof be “clear and convincing.” (Family Ct Act § 1046 [b] [ii].) Under this standard, the petitioner must “satisfy [the trier of fact] that the evidence makes it highly probable that what [it] claims is what actually happened.” (PJI 1:64 [2009]; see also Matter of Sheila G., 61 NY2d 368, 373 [1984] [termination proceeding]; Prince, Richardson on Evidence § 3-205 [Farrell 11th ed].) Since a finding of severe abuse can be the basis for a termination proceeding, this standard is not only statutory, but constitutionally required. (Santosky v Kramer, 455 US 745, 747-748 [1982] [striking the “fair preponderance” standard from New York law in termination proceedings].)
B. Presumptions: Family Court Act § 1046 (a) (ii) provides that a prima facie case of child abuse or neglect may be established by evidence of (1) an injury to a child which would ordinarily not occur absent an act or omission of the respondent, and (2) that the respondent was the caretaker of the child at the time the injury occurred. (Matter of Philip M., 82 NY2d 238, 243 [1993].) Notwithstanding the presumption, the burden of proof remains on the petitioner throughout the proceeding. However, if the foregoing is demonstrated, the burden of going forward shifts to the respondent. Once a prima facie case is established, there are four options. First, the respondent can rest, and the court must make its finding on the “strength of petitioner’s evidence.” (Id. at 244.) Alternatively, respondent can go forward and proffer evidence: (1) that when the injury or the neglect occurred, the child was not in the respondent’s care; or (2) the injury was in fact accidental; or (3) that the etiology of the condition or injury was not as set forth by petitioner. (Id.)
In analyzing the presumption further, it is noteworthy that its application is not limited to cases where “a child is never out *760 of the presence of his or her parents during the critical time period when an injury is sustained.” (Matter of Seamus K., 33 AD 3d 1030, 1038 [3d Dept 2006, Crew III, J., concurring in part, dissenting in part].) However, it is logical and could certainly be argued that where a number of people have access to the child during the critical time frame “and it is equally likely that the underlying injuries could have been inflicted by any one of those individuals as the other, the presumption simply cannot be invoked.” (Id. [emphasis added].) More particularly, if it is equally likely that someone other than the respondent caused the injury, the quantum of proof, a preponderance of the evidence, could not be met. However, even when others have access to the child, it still may be found more likely than not that the injury occurred while in respondent’s care. Under this scenario, in a standard neglect or abuse proceeding, the presumption would attach by a preponderance of the evidence. Of course, the foregoing analysis applies with a clear and convincing evidence standard when severe abuse or neglect are pleaded.
With these concepts in mind, petitioner’s claims will be examined.
C. The Neglect cases: Paragraph 5 of the petition alleges that the child is a neglected child, by a preponderance of the evidence. Family Court Act § 1012 (f) (i) (B) defines a neglected child as, inter alia, a child under 18 years of age whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of her parent to exercise a minimum degree of care by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, or by any other acts of a similarly serious nature requiring the aid of the court.
i. Failure to Seek Medical Attention: Paragraph 5 (a) (b)[2] of the petition alleges that the respondent neglected the child by failing to provide proper supervision or guardianship through her failure to “seek immediate medical attention for the child” (see amended petition, court exhibit 2). As a preliminary matter, pursuant to Family Court Act § 1012, the court finds, by any legal standard of proof, that the child is a child less than 18 and that mother is her parent, legally responsible for the child’s *761 care. Further, the petitioner has proven by a preponderance of the evidence that the respondent neglected the child by failing to obtain immediate medical attention. There is no need to utilize a presumption in this regard because the evidence was overwhelming.
First, the testimony and documentary evidence established, indeed, by clear and convincing evidence, that the child suffered a nonaccidental injury, demonstrated by a constellation of symptoms, known as shaken baby syndrome (SBS). The medical proof was uniform, complete and virtually unimpeached on this issue. All of the physicians testified that the child was violently shaken, at great speed, suffering broken ribs, subdural hematomas and retinal hemorrhaging. In fact, SBS was conceded by the mother during her testimony. Further, without even considering the cause of the injuries, the mother completely failed to “exercise a minimum degree of care” (Family Ct Act § 1012 [f] [i]) by neglecting to take the child to the hospital during the early hours of January 31, 2008. The sad fact is that she waited almost 48 hours, to a point where her child’s life was in clear jeopardy. The mother did not act as “an ordinarily prudent and loving parent, solicitous for the welfare of [the] child.” (Matter of Hofbauer, 47 NY2d 648, 655 [1979] [internal quotation marks omitted].)
More particularly, and as more fully set forth above, the child obtained her shots on January 30th. That night, the mother took the child to a Sesame Street show and upon returning home at 9:30 p.m., the child was irritable. The mother testified that the child was fussy from 1:00 a.m. until almost 4:00 a.m. So fussy, in fact, that she called her boyfriend in the middle of the night. The mother did not sleep during this time, but curiously never woke her father, a medical doctor. On the morning of January 31st, boyfriend picked the child up at approximately 6:00 a.m. and mother went to school. While at school, she said she called boyfriend to check on the child’s status while there. Boyfriend told her that the child was being “unresponsive.” After speaking to boyfriend, mother said she spoke with Ramona Bourne at the school and told her what boyfriend had told her about the child’s condition. Ms. Bourne told mother that she should take the child to the doctor given the fact that the child was “staring off into space” and “going limp.” Despite this advice, mother returned home from school and did not take the child to the doctor’s office. She claimed that she did call the doctor’s office at approximately 4:00 p.m. from her home, but *762 got no answer and didn’t take the child there because, “I end up waiting there for hours and I didn’t have the time.” This contrasts sharply with Nurse Allen’s testimony which indicated that respondent would often call her regarding the child’s health issues. Later in her testimony, however, mother said she went to the shopping mall after school until about 5:10 p.m. and was not even home until approximately 6:00 p.m.
It took the mother until February 2nd, after the child began to experience projectile vomiting, that the mother finally brought the infant to the emergency room. Under these facts, which the court finds have been established under any applicable standard of proof, the respondent neglected her child by failing to obtain proper and timely medical attention. At a bare minimum, the child should have been brought to her physician on Thursday, January 31st. As a direct result, the child’s physical condition was further impaired as demonstrated by the medical testimony.
ii. Shaken Baby Syndrome: Paragraph 5 (a) (c) of the petition alleges that respondent further neglected the child by “unreasonably inflicting or allowing to be inflicted harm or substantial risk of harm to the child by shaking the child, resulting in the child having to be hospitalized for bleeding on the brain.” (See amended petition, court exhibit 2.) As stated herein, the court has already determined that the child is a child less than 18 and that respondent is her parent, legally responsible for the child’s care. Moreover, the court has found by clear and convincing evidence that the child suffered a nonaccidental injury, demonstrated by a constellation of symptoms, known as shaken baby syndrome. As such, the preliminary jurisdictional issues have been established by petitioner.
Family Court Act § 1046 (a) (ii) provides that a prima facie case of child abuse or neglect may be established by evidence of (1) an injury to a child which would ordinarily not occur absent an act or omission of the respondent, and (2) that the respondent was the caretaker of the child at the time the injury occurred. Since the court has already found that the child suffered from SBS, the first part of the presumption has been met by petitioner. The remaining question is whether the petitioner has established, by a preponderance of the evidence, that “respondent[ ] [was] the caretaker[ ] of the child at the time the injury occurred.” (Matter of Chaquill R., 55 AD3d 975, 976 [2008].) The analysis of this issue depends on the time line of the injury and an assessment of the credibility of the wit *763 nesses. Because the court has determined that it is more likely than not that the injury occurred while the child was in the care of her mother, this cause of action is sustained.
(a) The Critical Time Line: The court heard a great deal of evidence from medical professionals as to the timing of the injury. The child was brought to the emergency room shortly past midnight on February 2nd. At the time, the child was exhibiting symptoms of projectile vomiting and possible seizure activity. Dr. Poonthota, the emergency room physician, was told that the baby had “shaking episodes” and “unresponsive episodes” which lasted, at a maximum duration, an hour, which caused her concern. The baby also presented with “dime sized bruises on both the sides above the nipples.” Dr. Poonthota, based upon the coloring, determined that the bruises were from an injury within the “past two or three days.” Dr. Poonthota testified that her physical findings were “incompatible” with the history given to her by the baby’s mother. After concluding her examination, Dr. Poonthota diagnosed the child with having shaken baby syndrome as well. The court found Dr. Poonthota’s testimony highly credible.
Based upon her testimony, the bruising, which is compatible with SBS, occurred between January 30th and January 31st. Further, on the morning of January 30th, Marianne Allen, R.N., saw the child and observed nothing wrong with her. In fact, Ms. Allen described the child as “a beautiful healthy baby.” Based on questions from the bench, Ms. Allen opined that she did not notice any bruising on the child’s chest on the morning of January 30th.
Because of the serious nature of the child’s condition, she was transferred to Albany Medical Center for specialized care in the Pediatric Intensive Care Unit (PICU). The testimony and records established that the child arrived in the PICU on February 2nd. An MRI, a CT scan and X rays were conducted and the child was thereafter seen by Dr. Walsh, the attending physician, on February 3rd. Dr. Walsh reviewed the records and findings and conducted a head to toe examination. Dr. Walsh noted that the child sustained subdural hematomas, healing/callousing rib fractures and retinal hemorrhaging. The doctor then opined that the constellation of these symptoms is indicative of SBS. The doctor also testified in great detail how this can occur and the potentially deadly nature of the injuries — “the child can sink into a deeper coma and potentially die from it.” The doctor also testified that the child was in “serious risk of death” upon *764 admission. On cross-examination, the time of the injury was discussed. Dr. Walsh testified, “with certainty,” that the injury occurred “less than [a] week before admission.” Since the child’s admission was on February 2nd, based upon these findings, that would open the window of the injury to January 27th.
With respect to the time frame issue, Dr. Mark Hite also testified. He is an ophthalmologist who first treated the child for the retinal hemorrhaging at Glens Falls Hospital on February 2nd. At that time he found the retinal hemorrhages in all four quadrants of both eyes. The doctor also saw the child for follow-up visits on February 28th and in April. On February 28th the problems were almost completely resolved. On cross-examination, the doctor opined, for various convincing reasons, that the retinal hemorrhages he observed on February 2nd were less than a week old.
In addition to the foregoing, respondent testified as to the events of the early morning on January 31st. During this testimony, the respondent was not consistent on several issues, including whether she was sleeping or awake throughout. She was also less than candid with regard to her visit to the mall the Thursday prior to the child’s admission. In addition, the court found her explanation about why the child was not brought to the hospital on Thursday lacking credibility.
The respondent presented no contrary expert testimony. As such, based upon the medical evidence taken as a whole, combined with Nurse Allen’s first-hand observations on January 30th, within the context of the credibility of the witnesses, the court finds that it is more likely than not that the child was injured during the early morning hours of January 31st. The court finds it particularly hard to believe that if the child suffered a traumatic injury, giving rise to subdural hematomas, healing/callousing rib fractures and retinal hemorrhaging, that Nurse Allen would not have observed anything of concern on the morning of January 30th. Indeed, it was during that night that the child was having a reaction to the vaccines and could not sleep. It was during that night that the respondent called her boyfriend at 3:00 a.m. This time frame fits well within the medical evidence, the records and the testimony, by a preponderance of the evidence. During this time, the mother was the sole caretaker of the child.
Even though respondent proffered absolutely no proof as to others who could have caused the injuries, the court has also considered the possibility of a wider time frame as well as the *765 possibility of other culpable parties. Nevertheless, if the time frame is extended back to Monday, January 28th, to beyond January 30th, the result does not change. During this time frame, the respondent, the respondent’s boyfriend, the boyfriend’s sisters and mother and the respondent’s father had some contact with the child. Also, some of the Washington County Early Head Start Program workers had contact with the child on January 28th. The court found the Head Start workers credible and that their testimony indicated they were never alone with the child. Further, the boyfriend testified that he was only alone with the child in his car, while transporting the child. In fact, upon questioning from the bench, boyfriend testified that his sisters were never alone to watch the child and his mother was always in the room. Neither his mother nor respondent’s father testified. As such, while there were others with access to the child,[3] there was no evidence proffered that any of them caused the injury. Further, there was no substantial evidence by way of testimony or documentary proof to negate the court’s conclusion that, based upon a preponderance of the evidence, the child was injured while in the care of her mother, and the shaking by her mother was the instrumentality causing the injury.
Accordingly, this cause of action is sustained, by a preponderance of the evidence, to the extent that respondent further neglected the child by “unreasonably inflicting or allowing to be inflicted harm or substantial risk of harm to the child, by shaking the child, resulting in the child having to be hospitalized for bleeding on the brain.”
D. The Abuse Case: Paragraph 4 alleges that the child is also an abused child. The relevant portion of Family Court Act § 1012 (e) defines an “abused child” as a child, less than 18, whose parent or person legally responsible for her care:
“(i) inflicts . . . physical injury by other than accidental means which causes or creates a substantial risk of death, ... or protracted impairment of physical or emotional health . . . , or “(ii) creates or allows to be created a substantial risk of physical injury to such child by other than accidental means which would be likely to cause *766 death ... or protracted impairment of physical or emotional health.”
This court has already found, by a preponderance of the evidence, that respondent shook the child causing the SBS and is responsible for the ensuing injuries. In addition, there is abundant, convincing and unrebutted medical testimony requiring the court to find that the array of physical injuries sustained by the child created a substantial risk of death or protracted impairment of physical health. Not only was this firmly established by the physicians’ testimony, but the fact that the child had to undergo a lengthy hospital stay, four subdural spinal taps, holes drilled into her skull to relieve cranial pressure, intensive medical intervention as well as a great deal of occupational and physical therapy all support this conclusion. At the time of the trial, the child was delayed four to six months. In fact, the full extent of the child’s physical and/or mental impairment may never be known.
Accordingly, petitioner has established, by a preponderance of the evidence, that the child is an abused child and this cause of action is sustained.
E. The Severe Abuse Case: As is relevant herein, Social Services Law § 384-b (8) (a) (i) defines a “severely abused” child as a child under the age of 18 that has been abused as a result of reckless or intentional acts of a parent committed under circumstances evincing a depraved indifference to human life, which results in a serious physical injury, as defined in section 10 (10) of the Penal Law, to wit, a physical injury which creates a substantial risk of death or causes death or causes a protracted impairment to health. As stated, severe abuse needs to be proven by clear and convincing evidence. In addition, courts have held that petitioner need also proffer evidence demonstrating that diligent efforts have been made by petitioner to strengthen the parent-child relationship.[4] (See e.g. Matter of Candace S., 38 AD3d 786, 788 [2d Dept 2007].)
Based upon the full record in this case, the court cannot sustain this claim. As stated previously, while a preponderance of the evidence exists to target the date of injury to January *767 31st, such evidence does not rise to the level of clear and convincing proof. First, the time frame expands as the degree of proof required is raised. The physicians testified that the injury could have occurred up to a week before February 2nd. This window expands the number of individuals caring for the child and, given that the injury can occur within seconds, determining culpability becomes more difficult. In particular, at a minimum, the boyfriend, his mother and respondent’s father all had some time alone with the child. Moreover, while boyfriend testified, neither his mother nor respondent’s father were called by the petitioner. As such, the court could not assess their credibility nor weigh their testimony. No reason was proffered for the failure to call these witnesses by petitioner or the respondent for that matter. These factors, along with the built in elasticity of the time line when measured against the clear and convincing evidence standard mitigates against a finding that the child was in the care of the mother at the time of the injury. Accordingly, petitioner did not prevail on the severe abuse cause of action.
Based on this finding, the court need not address the mens rea requirement of depraved indifference nor the diligent efforts issue.

. A transcript was ordered by the court and the parties. References are to that transcript.

. After the petitioner’s case-in-chief, the court dismissed the claim contained in paragraph 5 (a) (a). The court found that the petitioner failed to establish, by a preponderance of the evidence, that respondent failed to “maintain a safe, stable and adequate home for the child.”

. In most cases, there will be others with access to the child. As stated herein, this does not, per se, make the presumption inapplicable. In fact, it could be argued, that the difficulty in proof in such cases is the very reason for the presumption in a child protection proceeding.

. Most of these cases predate the current permanency legislation which requires regularly scheduled permanency hearings as part of an article 10 proceeding where a child has been removed and placed. (See Family Ct Act § 1089.) A mandatory and basic finding in these hearings is whether diligent efforts are being made by the agency to strengthen parent-child ties and reunify the family.