OPINION OF THE COURT
Barbara Salinitro, J.
*1005 Procedural History
On March 26, 2010, the Administration for Children’s Services (hereinafter petitioning agency), filed a petition pursuant to Family Court Act § 1012 against Candice J. (hereinafter respondent mother) and Allen S. (hereinafter respondent person legally responsible [PLR]) with respect to Amirah L. (hereinafter Amirah), born on July 5, 2006, alleging derivative severe or repeated abuse, derivative abuse, and derivative neglect. The petition alleges that based upon the respondent mother’s and respondent PLR’s acts and/or omissions that led to the death of Amirah’s younger sibling, Anniyah L. (hereinafter Anniyah), Amirah is a derivatively severely or repeatedly abused, abused, or neglected child, or in danger of becoming so. (See e.g. Matter of Alijah C., 1 NY3d 375 [2004] [finding deceased child may be subject of abuse petition brought on behalf of surviving sibling].)
On March 1, 2011, a fact-finding hearing in the matter commenced before the Honorable Ronald E. Richter (hereinafter Judge Richter). Judge Richter heard testimony on March 1, 2011, April 11, 2011, and June 13, 2011. Thereafter, Judge Richter resigned from the bench. On September 26, 2011, due the fact that the case was in a trial posture, the case was transferred to the court, who presides over the “trial part.”[1], [2] On September 6, 2012, the respondent PLR submitted to the court’s jurisdiction pursuant to Family Court Act § 1051 (a).[3] On that same date, since the respondent mother was the only remaining respondent in the case, a retrial in the matter commenced solely against her. The court heard testimony on September 6, 2012, September 7, 2012, September 10, 2012, *1006 September 11, 2012 and September 13, 2012. On September 13, 2012, the court heard summations. The respondent mother contended that the court should dismiss the petition against her since the petitioning agency had failed to meet its prima facie burden.[4] The petitioning agency maintained that it had proved severe and repeated abuse through clear and convincing evidence based upon the testimony and exhibits it presented for the court’s consideration.[5] The Attorney for the Child’s argument supported an abuse and neglect finding, and also supported the petitioning agency’s request for a severe and repeated abuse finding.[6] The court reserved decision.[7] For the reasons set forth hereinafter, the court enters findings against the respondent mother for derivative abuse and derivative neglect with respect to Anniyah’s surviving sibling, Amirah, and not for severe abuse or repeated abuse:
Evidence
The petitioning agency’s testimonial evidence consisted of the testimony of Maria Figueroa, the caseworker assigned to the instant case, and doctor Danielle Laraque, an expert in pediatrics and pediatric child abuse. The petitioning agency’s documentary evidence admitted during the course of the petitioning agency’s case for the court’s consideration consisted of an oral report transmittal (hereinafter ORT), dated March 25, 2010, another ORT, dated March 25, 2010, certified and delegated Mount Sinai Hospital medical records, and Anniyah’s death certificate, dated March 30, 2010. The respondent mother’s testimonial evidence consisted of doctor Simeon David, an expert in pediatrics and pediatric child abuse, and the respondent mother, who testified on her own behalf. The respon *1007 dent mother’s documentary evidence admitted during the course of the defense case for the court’s consideration consisted of an undated employment letter. The Attorney for the Child did not present evidence.
Testimonial Evidence
A. Petitioning Agency’s Case
The petitioning agency’s first witness was Maria Figueroa (hereinafter Ms. Figueroa), who testified that she is the child protective specialist assigned to the case.[8] Ms. Figueroa testified that on March 25, 2010, she went to Mount Sinai Hospital since Anniyah had died and the case was being considered a homicide. She told the court that while at the hospital, she spoke with detectives. Ms. Figueroa stated that when she initially tried to speak to the respondent mother, who was present at the hospital, the respondent mother was irate and belligerent with her, and told Ms. Figueroa that she had no right to be at the hospital. Ms. Figueroa testified that the respondent mother told her that “[Anniyah] just fell, that’s all that happened.” She stated that when she told the respondent mother that she was taking Amirah into custody, the respondent mother started screaming and yelling. Ms. Figueroa told the court that she gave the respondent mother her business card, but the respondent mother threw it back at her, ultimately taking her business card later that day. She stated that detectives escorted the respondent mother to a police precinct.
Ms. Figueroa testified that she interviewed Amirah, who was three years old at the time. She told the court that Amirah stated that she lived with the respondent mother and “Nini,” which was apparently how she referred to her sister, Anniyah. Ms. Figueroa stated that Amirah spontaneously blurted that Anniyah had fallen off of the bed and repeated this information to Ms. Figueroa several times without provocation. She testified that when she asked Amirah about her comment, Amirah told her that she did not actually see Anniyah fall off of the bed because she was watching television and eating pizza. Ms. Figueroa told the court that she then asked Amirah whether someone had told her to say that Anniyah fell off of the bed and Amirah said that the respondent mother told her to say so. Ms. Figueroa also stated that Amirah told her that during the previous evening, the respondent PLR took Anniyah into the *1008 bedroom, slammed the door, and the respondent mother was crying.
Ms. Figueroa testified that when she was able to interview the respondent mother, the respondent mother stated that in March 2010, Amirah and Anniyah were typically in day care during the day and that the respondent PLR took care of them during the evening while she was at work at CVS in Manhattan. She told the court that the respondent mother stated that her shift at CVS began at 10:00 p.m. and that she left Amirah and Anniyah in the respondent PLR’s care from approximately 8:50 p.m. when she left for work until approximately 7:00 a.m. or 8:00 a.m. when she returned home the following morning. Ms. Figueroa stated that Amirah and Anniyah usually slept through the night.
Ms. Figueroa testified that the respondent mother told her that about one year ago, she met the respondent PLR through her aunt who was dating the respondent PLR’s father. She told the court that the respondent mother stated that she was dating the respondent PLR and that he was practically living in her home, but since her rent voucher did not permit other people to live there, she did not share this information with her service provider. Ms. Figueroa stated that the respondent mother initially told her that she was unaware that the respondent PLR had an extensive criminal background, but that eventually the respondent mother disclosed that she knew that the respondent PLR had been in jail for gun possession. She testified that the respondent mother described her relationship with the respondent PLR as a good relationship, but that there had been some arguments between them about financial issues.
Ms. Figueroa told the court that on March 24, 2010 at approximately 7:00 p.m. she was home alone with Amirah and Anniyah, making dinner in the kitchen, when she heard a thump and then she heard Anniyah crying. She testified that the respondent mother stated that she went into the bedroom, picked Anniyah up from the floor, and asked Amirah what had happened. Ms. Figueroa stated that the respondent mother told her that Amirah stated that Anniyah was trying to climb up the bunk bed ladder and fell. She testified that the respondent mother told her that after the fall, Anniyah had redness on the left side of her face, a bruise and swelling on her left cheek, and blood on her lip. Ms. Figueroa told the court that the respondent mother stated that she did not think that the fall was severe, that she put some ice on Anniyah’s face, and that Anniyah *1009 seemed, fine. She stated that the respondent mother said that she gave Anniyah oatmeal because she had difficulty eating. Ms. Figueroa testified that the respondent mother told her that she next put Amirah and Anniyah to bed after which, at approximately 8:00 p.m., the respondent PLR arrived. She told the court that the respondent mother stated that she spoke to the respondent PLR during the course of the evening and that at approximately 8:00 a.m., the respondent PLR called to tell her to come home quickly. Ms. Figueroa stated that the respondent mother told her that when she returned home from work on March 25, 2010, Anniyah had left-sided bruising to her face, which was more swollen than the evening before. Ms. Figueroa testified that the respondent mother told her that Anniyah had vomited and had multiple bowel movements. She told the court that the respondent mother stated that she changed Anniyah’s soiled diaper and then took Anniyah to the hospital. Ms. Figueroa stated that the respondent mother told her that she did not call the 911 emergency number because she knew that the ambulance would take Anniyah to Elmhurst Hospital and she did not want Anniyah to be treated there because the respondent PLR had a bad experience at Elmhurst Hospital. She told the court that the respondent mother stated that she wanted Anniyah to go to Mount Sinai Hospital because the children’s pediatrician was there so she took a taxicab to Mount Sinai Hospital, arriving there at approximately 10:00 a.m. Ms. Figueroa stated that according to Mount Sinai Hospital records that she reviewed, Anniyah had been seen at Mount Sinai Hospital twice before in the Mount Sinai Hospital emergency room and one time at the clinic, and that Anniyah’s other appointments were either cancelled or she missed them.
Ms. Figueroa testified that the respondent mother said that she had been unaware what Anniyah’s injuries were until the police explained them to her. She told the court that the respondent mother stated that she did not have any concerns regarding the respondent PLR’s care of Anniyah until she learned about the extent of Anniyah’s injuries and then she thought that he may have done something to Anniyah. She stated that the respondent mother told her that several weeks prior, she noticed that Anniyah had a bruise on her face. Ms. Figueroa stated that the respondent mother told her that the respondent PLR stated that the girls had been playing and surmised that was probably how Anniyah got injured. She testified that the respondent mother stated that at the time, Amirah told the re *1010 spondent mother that she had hit Anniyah. Ms. Figueroa told the court that she explained to the respondent mother that Anniyah’s injuries were extremely severe and that Anniyah’s trauma was incompatible with the respondent mother’s explanation about them.
The petitioning agency next called doctor Danielle Laraque[9] (hereinafter Dr. Laraque), whom the court qualified, upon stipulation, as an expert in pediatrics and pediatric child abuse. Dr. Laraque testified that in March 2010, she worked at Mount Sinai Hospital as the General Academic Pediatrics Division head and that she was also in charge of the Child Abuse Unit. She told the court that when Anniyah arrived at Mount Sinai Hospital in cardiac arrest with acute injuries, she was contacted to be a consultant on the case because the emergency room physicians were questioning whether Anniyah’s injuries were a result of child abuse. Dr. Laraque stated that on March 25, 2010 at approximately 11:10 a.m., Anniyah’s initial triage took place. She testified that at that time, Anniyah’s eyes were closed, she was unresponsive to pain or stimuli, she had no pulse, no respiration, and she was not spontaneously breathing. Dr. Laraque testified that the doctors were intermittently resuscitating Anniyah. She stated that the left side of Anniyah’s face was extensively bruised from the top of her forehead to her chin, and she had chest bruising, abdominal bruising, and back bruising. Dr. Laraque testified that since Anniyah had to be intubated, she was not able to fully examine Anniyah’s mouth at that time. She told the court that Anniyah’s belly was tense which caused a concern regarding injury to Anniyah’s spleen, liver, and other organs in that area. Dr. Laraque stated that Anniyah’s genital exam was normal, but her anal exam revealed a spontaneous opening, her sphincter presented internally and externally, and she had a mucousy bloody discharge from her anus which caused a concern regarding injury to Anniyah’s intestine. She testified that Anniyah was taken for a CT scan because there was a concern that Anniyah might have suffered a head injury and Anniyah’s CT scan revealed that she had soft tissue swelling. Dr. Laraque told the court that since Anniyah died at 3:31 p.m., rather quickly after her admission to the hospital, there was a huge amount of information that could not be collected regarding her injuries because there were a number *1011 of studies for which there was no time to perform while Anniyah was alive. She stated that after death, blood is no longer flowing so a myriad of information that could be gleaned while a patient is alive is no longer viable after death. Dr. Laraque testified that after Anniyah died, a total body CT scan was performed upon her which revealed, inter alia, a jaw fracture corresponding to her bruising, a tension pneumothorax, a perforation of part of her intestine, blood around her heart, air in her abdomen and liver area, and multiple rib fractures in various stages of healing. She told the court that Anniyah’s older injuries were approximately two to three weeks old.
Dr. Laraque testified that she spoke to the respondent mother while Anniyah was critically ill. She told the court that the respondent mother was aware that it was likely that Anniyah might die. Dr. Laraque stated that she asked the respondent mother about the circumstances surrounding Anniyah’s admittance to Mount Sinai Hospital. She testified that the respondent PLR and Amirah were at the hospital in the general vicinity of where she was speaking with the respondent mother. Dr. Laraque told the court that the respondent mother stated that on March 24, 2010 at approximately 7:00 p.m. or 8:00 p.m., Amirah was climbing her bunk bed and Anniyah followed her up the ladder. Dr. Laraque stated that the respondent mother told her that she was in a different room from the girls and she heard a thump, followed by a cry. Dr. Laraque testified that the respondent mother told her that when she went into the room where her daughters were located, she saw Anniyah sitting on the floor being propped up by her hands, and that Anniyah’s face was red and swollen, and she had blood coming out of her mouth. She told the court that the respondent mother stated that she gave Anniyah oatmeal that evening because she thought that Anniyah could not chew, but she did not elaborate about why she believed that Anniyah would be unable to do so. Dr. Laraque stated that the respondent mother told her that other than those injuries, Anniyah was capable of playing and the respondent mother put her to bed that night without additional incident. Dr. Laraque testified that the respondent mother told her that she was the only adult in the house that night. She told the court that the respondent mother stated that on the next day, at approximately 9:00 a.m., she went to check on Anniyah and Anniyah was groaning, she had vomited and defecated, her face was a purple color, and she was unresponsive. Dr. Laraque stated that the respondent mother told her that she took a taxicab to the hospital.
*1012 Dr. Laraque conceded that a normal 19 month old would be incapable of describing her injuries and that rib fractures are typically unseen without an X ray unless the rib is sticking out of the chest. She also conceded that a reasonably prudent parent may or may not have brought Anniyah for medical attention, depending on that parent’s assessment of the child’s mood, behavior, and physical symptoms, such as bruising, vomiting, or difficulty breathing. She testified, however, that to a reasonable degree of medical certainty, there was multiple trauma to Anniyah and that those injuries were inconsistent with the respondent mother’s explanation of the one unwitnessed fall of her 19-month-old daughter, especially considering that some of Anniyah’s injuries were in a healing stage. She told the court that based upon a 19 month old’s developmental stage, Anniyah would not have been able to climb up to the top bunk of a bunk bed. She stated that if Anniyah possibly climbed part of the way up the bunk bed ladder, a fall from a low height was incompatible with her injuries, such as Anniyah’s broken jaw. Dr. Laraque testified, however, that she was not convinced that a 19 month old could climb up even one rung of a bunk bed on her own. In response to the petitioning agency’s hypotheticals, Dr. Laraque stated a fall from a standing position would not have resulted in the injuries that Anniyah sustained. She also stated that it would have been impossible for Anniyah to inflict those injuries on herself or for Amir ah, being three years old, to inflict such acute injuries on Anniyah such as she had. She further stated that the doctor’s resuscitation efforts did not cause the injuries to Anniyah since Dr. Laraque had consulted with the emergency room doctors who observed the bruising to Anniyah’s face, chest, and side prior to their treatment of her.
Dr. Laraque testified that to a reasonable degree of medical certainty, some of Anniyah’s rib fractures were shaking injuries, and that direct blows caused the injuries to Anniyah’s jaw, chest, and abdomen. She told the court that the respondent mother’s account of Anniyah’s minor facial bruising and swelling on the previous evening and her concomitant explanation for those injuries did not adequately explain Anniyah’s progression to being gravely ill the following morning. Dr. Laraque’s opinion of Anniyah’s cause of death, to a reasonable degree of medical certainty, was multiple trauma due to child abuse.
After the conclusion of Dr. Laraque’s testimony, the petitioning agency admitted into evidence certified and delegated Mount Sinai Hospital medical records and Anniyah’s certified and *1013 delegated death certificate. Thereafter, the petitioning agency rested.[10]
B. Respondent Mother’s Case
The respondent mother called doctor Simeon David (hereinafter Dr. David), whom the court qualified, upon stipulation, as an expert in pediatrics and pediatric child abuse. Dr. David testified that in preparation for his testimony, he reviewed Anniyah’s Mount Sinai Hospital medical records, the petitioning agency’s caseworker’s notes, the medical examiner’s autopsy reports, and the instant case’s original trial testimony, including his own testimony at that trial. Dr. David told the court that the respondent mother’s account of Anniyah’s left-sided facial injuries was consistent with a presumed fall from a bunk bed as she reported and that a fall can cause a chest bruise. He stated that typically, there would be no bruising or swelling around fractured ribs so a caretaker might not be alerted to a child’s fractured ribs unless a child was irritable or crying, but that there are other reasons why a child might be irritable or crying, such as teething or tiredness. Dr. David testified that since there is usually no treatment for nondisplaced rib fractures such as Anniyah had, failing to bring her to a doctor would not exacerbate those injuries. He conceded, however, that Anniyah’s injuries were extensive and acute, and that many of her injuries were caused by copious blows of severe force, including her brain injury, rib fractures, liver laceration, multiple intestines lacerations, hemorrhage to her heart and lung, and damaged spleen, kidney, pancreas, and adrenal glands. He also conceded that all of Anniyah’s injuries would not have been caused by her climbing up one rung of a bunk bed ladder, that she would have had to have been at least three to four feet off of the floor, and that even so, the injuries that Anniyah sustained were so significant that they would not have occurred from that type of fall. Dr. David testified that a direct blow or a compression of Anniyah’s rib cage, such as when a child is shaken, could have caused her nonacute rib fractures. Dr. David told the court in order for Anniyah’s jaw to have been broken, there would have been a large degree of force, such as a direct blow from that of an adult or a child older than three years old. Dr. David stated that a substantial amount of direct trauma caused Anniyah’s liver laceration and that such an injury was fatal since her heart *1014 would have been pumping blood and her lacerated liver would have been leaking that blood. Dr. David told the court that approximately seven tenths of Anniyah’s blood volume was outside of her blood vessels and heart, and inside her abdominal cavity. He postulated that was probably what caused her cardiac arrest since that amount of bleeding is grossly incompatible with life. Dr. David testified that her blood loss could have been the cause of her brain injury and that since her brain injury was diffuse, such trauma would have ultimately led to her death.
Dr. David testified that it was difficult to give an exact time as to when Anniyah’s injuries occurred, but that all of her injuries did not occur within the 24 hours preceding her death. Dr. David told the court that Anniyah’s injures were caused by more than one event. Dr. David’s reasoning that there was more than one incident involved with Anniyah’s injuries was based, in part, upon the calcification of some of her ribs, which he stated can occur 10 to 14 days after an injury in an adult, a bit less time in cases involving children since children heal faster. Dr. David stated that the autopsy report reflected blunt impact injuries to Anniyah’s head as well as her body and extremities. He told the court that the autopsy report contended that there could have been three separate incidents in which Anniyah’s injuries were sustained. Dr. David stated that he agreed with the autopsy report that there was more than one incident of trauma to which Anniyah was submitted and that child abuse was the cause of her death.
Next, the respondent mother testified on her own behalf.[11] The respondent mother testified that in February 2010, she was promoted to shift supervisor at CVS in Manhattan and she began to work evenings from 10:00 p.m. to 8:00 a.m. She told the court that she entered into an agreement with the respondent PLR that he would care for Amirah and Anniyah while she was at work. The respondent mother stated that in March 2010, the respondent PLR did not live with her, but he did frequently sleep over at her home. She testified that she remembers that March 24, 2010 was a Wednesday. The respondent mother told the court that on that day, Amirah and Anniyah did not go to day care and she spent the day with them. She stated that nothing of note occurred that entire day from the morning when Amirah and Anniyah awoke until 7:30 p.m. that evening. The respondent mother testified that at approximately 6:00 p.m., *1015 she began to cook dinner, and that she was preparing sloppy joes. She told the court that Amirah and Anniyah were in the bedroom, which is directly across from the kitchen. The respondent mother stated that there was no one else in the house but her, Amirah, and Anniyah. She testified that at approximately 7:30 p.m., she heard a thump and ran into the bedroom to check on Amirah and Anniyah. The respondent mother told the court that Amirah was on the top bunk of her bunk bed and that Anniyah was on her hands and knees on the floor. She stated that Anniyah said “mommy” so she rushed over to her and picked her up. The respondent mother testified that she observed the left side of Anniyah’s face was red and a little swollen. She told the court that she asked Amirah what happened and Amirah told her that Anniyah fell when she was trying to follow Amirah up the bunk bed ladder. The respondent mother remembered that about a month earlier, she had seen Anniyah climb the bunk bed ladder all the way to the top bunk. She told the court that she took Anniyah to the bathroom, and put cold water and ice on Anniyah’s face. The respondent mother stated that Anniyah seemed fine. She testified that Anniyah was pushing out of her arms because she wanted to play so she put Anniyah down and went to finish cooking. The respondent mother told the court that about 10 minutes later, she fed Amirah and Anniyah; Amirah ate some sloppy joe, sitting at her table in the respondent mother’s bedroom, and the respondent mother fed Anniyah oatmeal in the bathroom because she was getting ready for work. She stated that even though there was no indication that Anniyah could not chew, she fed her oatmeal, and not the sloppy joe that she had prepared. The respondent mother testified that Anniyah did not appear to have difficulty eating. She told the court that she changed Amirah’s and Anniyah’s clothing and put them both to bed at 8:30 p.m. The respondent mother stated that prior to putting Anniyah to sleep, she looked at Anniyah’s face and it was a little pink, but not swollen. She testified that she examined Anniyah’s mouth and teeth, and the rest of her body, but everything appeared normal. The respondent mother told the court that before she put Anniyah to bed, she changed Anniyah’s diaper, but there was nothing unusual about her diaper change, and Anniyah was acting as though she felt well. She stated that she asked Anniyah if anything hurt her, but Anniyah did not answer. The respondent mother testified that at approximately 8:40 p.m., the respondent PLR arrived and started removing his clothes in order to relax. She *1016 told the court that at approximately 8:50 p.m., she left for work that evening. The respondent mother stated that prior to leaving for work that evening, she did not tell the respondent PLR that Anniyah had fallen earlier that day. She testified that she did not observe any interaction between the respondent PLR and Amirah and Anniyah that night.
The respondent mother told the court that several times that evening, she had telephone contact with the respondent PLR. She stated that she called the respondent PLR at 10:00 p.m. when she arrived at work to check in with him, she spoke to him briefly at midnight, she had a conversation with him at 6:00 a.m. during which he asked her when she was getting off from work, and she spoke to him at 8:00 a.m. at which point he told her that Anniyah was sick, that he did not know what was wrong with her, and that the respondent mother needed to quickly come back home. The respondent mother testified that during their other telephone conversations that night, the respondent PLR did not tell her that either child was having issues and she never asked him how the girls were doing. She told the court that when she got home at approximately 9:00 a.m. on March 25, 2010, she rushed to see Anniyah, who was in the respondent mother’s room on the bed, instead of in her own bed. The respondent mother stated that Anniyah was alone, lying on her side, and breathing normally, but when she turned Anniyah over, the whole left side of Anniyah’s face was purple. She testified that Anniyah had defecated in her diaper so she changed Anniyah’s diaper. The respondent mother told the court that other than Anniyah’s face’s purplish color, she saw no other signs or symptoms of injury on Anniyah. She explained that the room was dark when she changed Anniyah’s diaper. The respondent mother stated that she asked the respondent PLR what had happened to Anniyah and he responded that he did not know. The respondent mother testified that she got Amirah and Anniyah dressed and got the diaper bag ready to take them to the hospital so that Anniyah could receive medical care.
The respondent mother told the court that she decided to take a taxicab to Mount Sinai Hospital because that was the location where a pediatrician last saw the children. She stated that she did not want to go to Elmhurst Hospital because on a prior occasion while she was with the respondent PLR, he had a bad experience at that hospital. The respondent mother told the court that Elmhurst Hospital was a busy hospital and there were numerous criminal convicts walking around that hospital. *1017 She testified that the respondent PLR hailed a taxicab for them. The respondent mother stated that due to being distraught, she did not recall much of what happened revolving around Anniyah’s death. She testified that she did not remember when she left her home for the hospital, but stated that at approximately 10:00 a.m. or sometime thereafter, she arrived at Mount Sinai Hospital. She also told the court that she did not remember if there had been traffic that day while she was being driven to the hospital in the taxicab. The respondent mother further stated that she did not recall whether she had a conversation with the respondent PLR on the way to the hospital in the taxicab. The respondent mother told the court that she was not angry at the respondent PLR because she was more concerned about Anniyah’s health.
The respondent mother testified that when she got to Mount Sinai Hospital, she checked in at the desk, where they took her information and she was told to sit down and wait. She told the court that about 10 minutes later, she saw Anniyah’s eyes roll back into her head so she knocked on the triage window. The respondent mother stated that she showed the nurse the side of Anniyah’s face and the nurse escorted them to the back. She testified that she spoke to a male doctor, but she did not remember his name. She also testified that she spoke with Dr. Laraque, but that she did not remember their conversation. The respondent mother told the court that Ms. Figueroa briefly questioned her. She stated that the police arrived at the hospital and that she and the respondent PLR were taken to a police precinct where she was questioned about what happened to Anniyah. The respondent mother testified that after two days of questioning, no criminal charges were filed against her. She told the court that she did not know that Anniyah had died until she was at the police precinct and the police told her.
The respondent mother testified that during the two months preceding March 24, 2010, Anniyah did not present with abnormal irritability, vomiting, lethargy, or bruising. She told the court that prior to March 24, 2010, Anniyah suffered some minor injuries that occurred when she was playing with Amirah. The respondent mother explained that Amirah pushed Anniyah and she fell on the radiator, which scratched her. She stated that she cleaned Anniyah’s scratch and put a band aid on it, but that Anniyah’s scratch did not require medical attention. The respondent mother testified that she was not aware that Anniyah had broken ribs, and that Anniyah never acted as though she were in pain.
*1018 The respondent mother testified that on March 24, 2010, she had already been in a relationship with the respondent PLR for about nine months. She told the court that initially she did not know about the respondent PLR’s criminal history, but that during their relationship when she was asking him about his past relationships, she found out that he had been to jail based upon a gun possession charge and that he was on parole. She admitted that despite being aware of his gun conviction, she permitted him to take care of her children. The respondent mother denied having a fight with the respondent PLR on the evening before Anniyah’s admittance to Mount Sinai Hospital. She told the court that Amirah was not telling Ms. Figueroa the truth when she made that statement, but that everything else that Amirah told Ms. Figueroa was accurate.
C. Attorney for the Child’s Case
The Attorney for the Child did not present testimonial evidence.
Documentary Evidence
A. Petitioning Agency’s Case
Admitted into evidence during the petitioning agency’s case was an oral report transmittal, dated March 25, 2010, with the mandatory reporter being Leigh Penner, a social worker at Mount Sinai Hospital. The CRT’s narrative states:
“Anniyah (age 1) has broken mandible, rectal tear, rectal bleeding & low rectal tone. Anniyah has Penumo Thorax to her right side. Anniyah has Hemotoma to the left side of her face. Mother says Anniyah fell off the lower rung of a ladder (to lower bunk bed).This injury occurred on March 24, 2010. Mother said the child had swelling and mother brought the child by taxi to emergency room today March 25, 2010, around 10:00am. Mother’s explanation is not consistent with the nature of the injuries sustained. The injury was inflicted. The role of the other child is unknown.” (See petitioner’s exhibit 1.)
Also admitted into evidence during the petitioning agency’s case was another oral report transmittal, dated March 25, 2010, with the mandatory reporter being Emily Banach, a social worker at Mount Sinai Hospital. The CRT’s narrative states:
“Last night, 03/24/10 between 7pm and 8pm, Amara (3) and Anniyah (1) were unsupervised in their *1019 bedroom. Anniyah fell from the lower bunk bed, injured her cheek, and the child was sent to bed. This morning, 03/25/10, Anniyah woke up lethargic, vomiting, with increased bowel movements and rectal bleeding. Mother brought both children from Queens to Mount sinai hospital in Manhattan via taxicab. Anniyah was pronounced dead on 03-25-10. After a medical examination, the child has multiple bruises, injuries, and trauma to both sides of her body. The explanation is inconsistent with the injury, therefore, mother (Candace) is held responsible.” (See petitioner’s exhibit 2.)
Moreover, admitted into evidence during the petitioning agency’s case were certified and delegated Mount Sinai Hospital medical records which reveal that on March 25, 2010 at approximately 10:52 a.m., Anniyah, an approximately 19-month-old child, arrived at Mount Sinai Hospital by taxi. (See petitioner’s exhibit 4.) The records also reveal that Anniyah was accompanied by the respondent mother, who carried her into the emergency department, and the respondent mother’s boyfriend, Allen.[12] (Id.) The records further reveal that Anniyah presented with major chest and respiratory trauma. (Id.) The records show that her pupils were fixed and dilated bilaterally, she had diffuse left-sided facial bruising and right rib bruising, and she was cold, pale, and pulseless. (Id.) The records also show that Anniyah was in cardiac arrest. (Id.) The records further show that due to the extreme nature of her condition,[13] Anniyah was immediately intubated, and cardiac pulmonary resuscitation as well as advanced cardiac life support was performed upon her, after which a CT scan was performed upon her. (Id.) The records disclose that Anniyah was then transferred to the Pediatric Intensive Care Unit where she presented as unresponsive to all stimuli. (Id.) The records also disclose that Anniyah was provided with emergency care, including transfusions, drug therapy, oxygen administration, catheterization, intubation, ventilation, and ongoing cardiac pulmonary resuscitation. (Id.) The records further disclose that at 3:31 p.m., after approximately three hours of ongoing intermittent resuscitation, Anniyah had multiorgan failure, her blood pressure was *1020 nonexistent, and her heart stopped beating. (Id.) The records indicate that, at that point, Anniyah was pronounced dead since there was no further treatment that medical personnel could provide to resuscitate her. (Id.) The records show that the respondent mother was tearful when she arrived at the Mount Sinai emergency room, and crying at times at Anniyah’s bedside during the infant’s attempted resuscitation. (Id.) The records reveal that a postmortem examination of Anniyah showed the following injuries: (1) severe head trauma; (2) a mandible fracture; (3) a large right-sided tension pneumothorax with a partial collapse of the underlying right lung; (4) air located in, inter alia, Anniyah’s chest, esophagus, urinary bladder, left shoulder socket, membrane that covers her abdominal and pelvic cavities, colon, and rectum; (5) fluid in her small bowel, abdominal cavity, and around her heart; (6) an enlarged heart; (7) a collapsed urinary bladder; (8) bilateral hypo-dense kidneys; (9) multiple rib fractures, some in healing stages; (10) a rectal tear and rectal bleeding; (11) the heart and mediastinal structures including the esophagus, trachea, and thymus were displaced to the left; and (12) soft tissue swelling and infiltration over her left cheek and eye. (Id.) The records disclose that respondent mother told hospital staff that at approximately 7:00 p.m. or 8:00 p.m. the day before Anniyah’s admission, she had fallen from a low rung of a bunk bed ladder, but that the respondent mother did not witness the fall. (Id.) The records also disclose that the respondent mother told hospital staff that at approximately 9:30 p.m., Anniyah went to bed and was fine, except for bruising on the left side of her face. (Id.) The records further disclose that the respondent mother told hospital staff that she brought Anniyah to the hospital that day because Anniyah had been vomiting and stooling, and ultimately had become lethargic and blue. (Id.) The records state that child abuse is suspected since the injuries sustained were inconsistent with the respondent mother’s explanation for what had caused them. (Id.)
The records show that the respondent mother brought Anniyah to Mount Sinai Hospital on three prior occasions. (Id.) The records show that the first occasion was on July 18, 2009 for an eye problem in which Anniyah’s right eye was tearing, with no redness, itching, discharge, pain, or fever. (Id.) The records also show that Anniyah was discharged home and advised to return if symptoms failed to resolve or worsened. (Id.) The records disclose that the second occasion was on July 22, 2009 *1021 for an inner lower lip laceration after Anniyah fell and hit her mouth against a bed for which she received three stitches. (Id.) The records also disclose that Anniyah was stable and ambulatory, and she was discharged home. (Id.) The records reveal that the third occasion was on August 7, 2009 for a well visit. (Id.) The records reveal that the respondent mother stated that she had recently moved with Anniyah and Amirah from Far Rock-away to the city where she had been transferred through her employment as the CVS photo department manager. (Id.) The records also reveal that the respondent mother stated that she was living in a shelter with her two daughters while she was looking for an apartment. (Id.) The records further reveal that other than diaper rash, Anniyah was assessed as growing and developing well. (Id.)
The records show that the petitioning agency reported to Mount Sinai Hospital that the respondent mother had two previous child protective cases with them. (Id.) The records disclose that the petitioning agency reported that one case involved the respondent mother’s mental health when it was alleged that she left Amirah home strapped to a car seat while she was on the roof, threatening to kill herself; that case was deemed unfounded. (Id.) The records reveal that the petitioning agency reported that the other case involved locating housing for the respondent mother. (Id.) The records indicate that the petitioning agency stated that when the respondent mother received housing, she divulged that a past boyfriend had been abusive to her, and the case was indicated for domestic violence in the presence of Amirah. (Id.) The records show that ACS stated that case was kept open for preventative services. (Id.)
Further, admitted into evidence during the petitioning agency’s case was Anniyah’s death certificate, dated March 30, 2010, deeming her manner of death, after an autopsy, as a homicide as a result of child abuse. (See petitioner’s exhibit 5.) Anniyah’s immediate cause of death was determined to be “Blunt Impacts Of Head And Torso With Fractures And Visceral Injuries.” (Id.) Her date and time of death were set at March 25, 2010 at 3:31 p.m. (Id.)
B. Respondent Mother’s Case
Admitted into evidence during the respondent mother’s case was an undated employment letter, stating: “To Whom It May Concern, Candice J. works for CVS/Pharmacy. On March 24-25, 2010, she did an overnight shift from 10pm on the 24 and she left at 8am on the 25. Any questions feel free to contact us at *1022 (212) 260-3052. Thank You D’Juana Martinez Store Manager.” (See respondent’s exhibit A.)
C. Attorney for the Child’s Case
The Attorney for the Child did not present documentary evidence.
Proving Child Protective Cases
In an article 10 fact-finding hearing, the petitioning agency has the burden of proof. In neglect or abuse cases, the Family Court must determine that the petitioning agency proved the case by a preponderance of the evidence. (See Family Ct Act § 1046 [b] [i]; see also Matter of Tammie Z., 66 NY2d 1 [1985] [affirming neglect findings and rejecting argument that, in light of Santosky v Kramer (455 US 745 [1982]), neglect findings should be based upon clear and convincing evidence].) A preponderance of the evidence means “that degree of proof which is more probable than not.” (Black’s Law Dictionary 1182 [6th ed 1990].) Family Court Act § 1012 (f) dictates that a neglected child is a child younger than 18 years old “whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care.” (Family Ct Act § 1012 [f] [i]; Nicholson v Scoppetta, 3 NY3d 357, 368 [2004]; Matter of Tylasia B. [Wayne B.], 72 AD3d 1074, 1075 [2d Dept, Apr. 27, 2010]; Matter of Ashanti R., 66 AD3d 1031, 1031 [2d Dept, Oct. 27, 2009].) Family Court Act § 1012 (e) (i) states, in pertinent part, that an abused child is a child younger than 18 years old whose parent or other person legally responsible for his or her care “inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ.” (Matter of Commissioner of Social Servs. of City of N.Y. v Abigail A., 219 AD2d 652, 652 [2d Dept, Sept. 18, 1995]; Matter of Marcus S., 123 AD2d 702, 702 [2d Dept, Oct. 14, 1986].) Thus, the petitioning agency must present evidence sufficient to meet the aforementioned neglect or abuse elements by a preponderance of the evidence.
In severe or repeated abuse cases, the Family Court must decide that the petitioning agency proved the case through clear and convincing evidence. (See Family Ct Act § 1046 [b] [ii].)
*1023 Clear and convincing evidence is a higher standard than preponderance of the evidence. (See Black’s Law Dictionary 251 [6th ed 1990] [clear and convincing proof is “(p)roof which requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt”].) Clear and convincing evidence is evidence that is “ ‘entirely satisfactory’ and creates a genuine belief’ that the respondent committed or omitted the acts alleged in the petition. (E.g. Matter of Jane PP. v Paul QQ., 65 NY2d 994, 996 [1985]; Matter of Johnson v Jones, 247 AD2d 617 [2d Dept 1998]; Black’s Law Dictionary 251 [6th ed 1990] [clear and convincing proof is “(t)hat proof which results in reasonable certainty of the truth of the ultimate fact in controversy . . . where the truth of the facts asserted is highly probable”]; see also Matter of Child, 25 Misc 3d 745, 759 [Fam Ct, Washington County, Dec. 10, 2008] [clear and convincing evidence means that “the petitioner must ‘satisfy (the trier of fact) that the evidence makes it highly probable that what (it) claims is what actually happened’ ” (quoting PJI 1:64)].) Family Court Act § 1012 (j) prescribes that severe or repeated abuse are aggravated circumstances within Social Services Law § 384-b (8)’s definition. (See Family Ct Act § 1012 Q]; see also Social Services Law § 384-b [8].) Social Services Law § 384-b (8) (a) (i) states, in relevant part, that a severely abused child is a child who has been found to be abused as a result of a parent’s intentional or reckless acts “committed under circumstances evincing a depraved indifference to human life, which result in serious physical injury to the child as defined in [Penal Law § 10.00].” Social Services Law § 384-b (8) (b) (i) (A) and (ii) (A) set forth, in pertinent part, that a repeatedly abused child is a child who has been found to be abused as a consequence of his or her parent’s acts, and his or her parent has a prior abuse finding, within five years immediately predating the petition’s filing in which said abuse is found, regarding that child or another child for whom that parent is or has been legally responsible. (See Social Services Law § 384-b [8] [b] [i] [A]; [ii] [A]; see also Matter of Alijah C., 1 NY3d 375, 379 [2004].) Hence, the petitioning agency must present evidence sufficient to meet the aforementioned severe abuse or repeated abuse elements by clear and convincing evidence.
In the instant case, the petitioning agency’s petition against the respondent mother was pleaded in the alternative, alleging both derivative severe or repeated abuse as well as derivative abuse and derivative neglect. The court’s finding may be a find *1024 ing of derivative severe abuse or derivative repeated abuse, derivative abuse, or derivative neglect, or all four, so long as the appropriate standard is applied. (See e.g. Family Ct Act § 1051; Matter of Madison C., 59 AD3d 947, 947 [4th Dept, Feb. 6, 2009] [affirming Family Court’s consideration of severe abuse’s lesser included offense of abuse and determination that child was abused child by preponderance of the evidence, and not by clear and convincing standard for severe abuse]; Matter of Sharnetta N., 120 AD2d 276, 279-282 [1st Dept 1986] [reversing petition’s dismissal, which pleaded both abuse and neglect, for the entry of a neglect finding where although proof of abuse lacking, evidence of neglect present].)
Res Ipsa Loquitur
Family Court Act § 1046 (a) (ii) is a fault-based statute, prescribing that
“proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect, as the case may be, of the parent or other person legally responsible.” (See Family Ct Act § 1046 [a] [ii]; see also Matter of Philip M., 82 NY2d 238, 243-244 [1993]; Matter of Jaiden T.G. [Shavonna D.-F], 89 AD3d 1021, 1022 [2d Dept, Nov. 22, 2011]; Matter of Alanie H. [Crystal D.], 69 AD3d 722, 723-724 [2d Dept, Jan. 12, 2010]; Matter of Aniyah F., 13 AD3d 529, 530-531 [2d Dept 2004].)
Where a child is injured and it is unclear as to who caused the injuries and when and where the child’s injuries occurred, traditional res ipsa loquitur principles apply. (See Matter of Philip M., 82 NY2d at 244 [section 1046 (a) (ii) “authorizes a method of proof which is closely analogous to the negligence rule of res ipsa loquitur . . . modeled on the res ipsa loquitur doctrine”]; see also Matter of Jaiden T.G., 89 AD3d at 1022.) The res ipsa loquitur negligence doctrine is an evidentiary rule dictating that absent a reasonable alternative explanation, a presumption of culpability will exist from proof that the character and circumstances surrounding an incident demonstrate that but for the alleged wrongdoer’s negligence, the injury would not have taken place. (See Black’s Law Dictionary 1305 [6th ed 1990].)
*1025 The petitioning agency bears the burden of proving res ipsa abuse or neglect by a preponderance of the evidence that a respondent’s actions or omissions more likely than not caused the child’s injuries. (See Family Ct Act § 1046 [a] [ii]; [b] [i]; see also Matter of Philip M., 82 NY2d at 243-244; Matter of Alanie H., 69 AD3d at 723-724; Matter of Aniyah F., 13 AD3d at 530.) Where a prima facie case is established, a rebuttable presumption exists, and the burden of going forward, but never the burden of proof, shifts to the respondent. (See Matter of Jaiden T.G., 89 AD3d at 1022; see also Matter of Aniyah F., 13 AD3d at 530.) The respondent can then choose not to present a case, or the respondent may seek to show that the child was not in the respondent’s care at the time that the child was injured, that the injury could have reasonably occurred accidentally without the respondent’s acts or omissions, or counter the evidence of the child’s condition which formed the basis for the petition’s filing. (See Matter of Philip M., 82 NY2d at 244-245; see also Matter of Jaiden T.G., 89 AD3d at 1022-1023.) In deciding whether a respondent has effectively rebutted the presumption of culpability, the court must consider factors, including but not limited to, the prima facie case’s strength, the witnesses’ credibility, the victim child’s age, relevant medical or scientific evidence, and, given all of the circumstances, the reasonableness of the respondent’s alternative theory for the victim child’s injuries. (See Matter of Philip M., 82 NY2d at 246.) In determining the reasonableness of a respondent’s explanation, the court may consider a respondent’s actions or inactions upon discovering the child’s injuries and any inferences to be drawn therefrom. (Id.) Certainly, where a respondent offers no alternative theory for the child’s injuries, the court must contemplate such factor in its assessment of the evidence. (Id.)
In the instant res ipsa case, the court finds that the petitioning agency proved abuse and neglect by a preponderance of the evidence. The evidence established that during the relevant time period in which Anniyah sustained serious traumatic injuries which culminated in her death, both the respondent mother and the respondent PLR cared for Amir ah and Anniyah. The evidence showed that the harm to Anniyah was inflicted on more than one occasion with the most severe injuries occurring within the last day of her life. The evidence demonstrated that the respondent mother’s explanation for Anniyah’s injuries, an unwitnessed fall from a bunk bed ladder, was incompatible with the nature and degree of trauma An *1026 niyah’s tiny body endured. Dr. Laraque testified that given Anniyah’s developmental stage at 19 months, it was inconceivable that she would have been able to climb to the top of a bunk bed ladder. She also told the court that even if Anniyah were able to climb a few rungs of the bunk bed ladder, she would not have suffered all of the injuries with which she presented. The court finds notable and compelling Dr. Laraque’s testimony that the respondent mother told her that she had been the only adult in the home that evening with Amirah and Anniyah.
When the burden of going forward shifted to the respondent mother, she testified with the same explanation that Anniyah’s injuries were the result of a fall after having climbed up a bunk bed ladder, but her testimony with regards to the details was inconsistent with Ms. Figueroa’s testimony and Dr. Laraque’s testimony about their conversations with her. Most damning was the fact that the respondent mother’s own expert testified consonant with the petitioning agency’s expert that Anniyah’s injuries were significant and that the respondent mother’s account of Anniyah’s fall did not comport with all of Anniyah’s trauma. In short, both the petitioning agency’s expert and the respondent mother’s expert stated that their opinion was that Anniyah suffered multiple acute trauma on more than one occasion that ultimately led to her death as a result of acts of child abuse. Consequently, the respondent mother’s explanation for Anniyah’s serious injuries was not feasible and certainly not reasonable. (See Matter of Daughtry A. [Massiel E.], 94 AD3d 878, 878-879 [2d Dept, Apr. 10, 2012] [affirming neglect finding where respondent failed to offer “credible and reasonable explanation of how the child sustained the injuries” to rebut prima facie case]; see also Matter of Aniyah F., 13 AD3d at 531 [respondents failed to provide a satisfactory explanation for the (child’s) injuries; reversed and abuse findings entered against mother and aunt].)
In its assessment of the evidence, the court credits the testimony of the disinterested witnesses,[14] caseworker, Ms. Figueroa, the petitioning agency’s expert, Dr. Laraque, and the respondent mother’s expert, Dr. David, and found the respondent mother’s testimony to be largely self-serving, inconsistent, *1027 and incredible.[15] In the interest of brevity, the court now recounts some, but not all, of the problems with the respondent mother’s testimony. First and foremost, it is incredulous that in referring to the time period revolving around the last two days of Anniyah’s life, which the court surmises was surely the most harrowing and memorable event of the respondent mother’s existence, she told the court that she did not remember much of what happened. The court finds unbelievable that the respondent mother told the court that she did not recall whether she had a conversation with the respondent PLR on the way to the hospital in the taxicab, or whether there was traffic that morning en route to the hospital. The court finds inconceivable the respondent mother’s testimony that despite Anniyah’s condition, the respondent mother was not mad at the respondent PLR that morning when he was responsible for Anniyah’s care overnight. The courts finds doubtful, given the urgency of the situation, the respondent mother’s testimony that the reason that she did not call the 911 emergency telephone number about Anniyah’s injury is because the ambulance would have transported her to Elmhurst Hospital where she did not want to go. The court finds telling that in response to the court’s question about why, if she did not want to go to Elmhurst Hospital, the respondent mother did not choose another Queens hospital that was closer than Mount Sinai Hospital, she stated that she did not have an answer. Moreover, notwithstanding the medical evidence regarding the incompatibility of Anniyah’s trauma with the respondent mother’s explanation for them, the court finds the respondent mother’s explanation unlikely in light of her own testimony. For example, the respondent mother’s testimony that on the evening after Anniyah’s fall, she fed Anniyah oatmeal because she was not sure if she could chew when the re *1028 spondent mother described Anniyah’s injuries as being minor, and that Anniyah was fine and almost immediately after the fall, she wanted to play. As another example, the respondent mother’s testimony that prior to leaving the children in the respondent PLR’s care, she did not inform the respondent PLR that Anniyah had fallen earlier that day. As a further example, the respondent mother’s testimony that despite speaking to the respondent PLR several times overnight, the respondent mother never asked him how her children were doing, more specifically how Anniyah was doing. Additionally, the court finds dubious that the respondent mother testified that when she came home from work and found Anniyah sleeping in her bed, instead of Anniyah’s own bed, she never inquired of the respondent PLR as to how Anniyah got there. The court finds incredible that the respondent mother testified that she had seen Anniyah, a 19-month-old child, climb to the top of the bunk bed ladder a month earlier, without incident, when that feat was in direct contravention to her developmental stage. The court finds implausible the respondent mother’s testimony that, in the morning when she came home from work and prior to taking Anniyah to the hospital, other than noticing that the left side of Anniyah’s face was purple, and even though she changed Anniyah’s diaper, she observed no other injuries on her. Finally, much of the respondent mother’s testimony was at variance with the other witnesses’ testimony as well as the medical records.
Thus, the court finds that the petitioning agency proved by a preponderance of the evidence that the respondent mother’s actions or omissions more likely than not caused Anniyah’s injuries since during the time period when the respondent mother and the respondent PLR were caring for her, Anniyah suffered serious traumatic injuries for which there is no sufficient explanation. Accordingly, the court enters derivative abuse and derivative neglect findings against the respondent mother with respect to Anniyah’s surviving sibling, Amirah.[16] The court is, however, constrained not to enter a derivative se *1029 vere abuse or derivative repeated abuse finding against the respondent mother as will be discussed hereinafter:
Severe Abuse and Repeated Abuse
In the context of child protective proceedings, the severe abuse and repeated abuse definitions are reached through examining a conglomeration of statutes in conjunction with each other. The Family Court Act refers to severe abuse and repeated abuse as aggravated circumstances within the meaning of Social Services Law § 384-b (8). (See Family Ct Act § 1012 Q]; see also Social Services Law § 384-b [8].) For the purposes of a repeated abuse definition, Social Services Law § 384-b (8) (b) (i) (A) and (ii) (A) must also be examined. (See Social Services Law § 384-b [8] [b] [i] [A]; [ii] [A].) Social Services Law § 384-b (8) (b) (i) (A) and (ii) (A) define a repeatedly abused child as a child who has been found to be abused as a consequence of his or her parent’s acts, and his or her parent has a prior abuse finding, within five years immediately predating the petition’s filing in which said abuse is found, regarding that child or another child for whom that parent is or has been legally responsible. (See Social Services Law § 384-b [8] [b] [i] [A]; [ii] [A]; see also Matter of Alijah C., 1 NY3d at 379.) In the instant case, the court declines to enter a repeated abuse finding against the respondent mother since the petitioning agency presented no evidence demonstrating that a prior abuse finding was ever entered against the respondent mother. (See Social Services Law § 384-b [8] [b] [i] [A]; [ii] [A]; see also Alijah C., 1 NY3d at 379.) Accordingly, the court dismisses those portions of the petitions in conformity with the reasoning set forth within this decision.
For the purposes of a severe abuse definition, Social Services Law § 384-b (8) (a) (i), Penal Law §§ 10.00 (10) and 15.05 (1) and (3), and case law must also be examined. (See Social Services Law § 384-b [8] [i]; see also Penal Law §§ 10.00 [10]; 15.05 [1], [3]; People v Bussey, 19 NY3d 231 [2012]; Matter of Marcus C., 46 AD3d 816 [2d Dept, Dec. 18, 2007].) Social Services Law § 384-b (8) (a) (i) dictates, in pertinent part, that a severely abused child is a child who has been found to be abused as a result of a parent’s[17] intentional or reckless acts “committed *1030 under circumstances evincing a depraved indifference to human life, which result in serious physical injury to the child as defined in [Penal Law § 10.00].” An intentional act occurs when the actor’s “conscious objective is to cause such result or to engage in such conduct.” (Penal Law § 15.05 [1].) A reckless act transpires when the actor
“is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.” (Penal Law § 15.05 [3].)
A depraved indifference to human life means “utter disregard for the value of human life — a willingness to act not because one intends harm, but because one simply doesn’t care whether grievous harm results or not.” (Bussey, 19 NY3d at 236 [where codefendants beat victim for several minutes and appellant helped codefendants transport victim in his vehicle’s trunk to creek 18 miles away, finding appellant did not exhibit depraved indifference to victim’s life]; Marcus C., 46 AD3d at 817 [no depraved indifference mental state where appellant not aware that handgun possessed contained live round; modifying dispositional order to reduce charges].) Serious physical injury is “physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.” (Penal Law § 10.00 [10].)
Given the severe abuse meaning, the court is unconvinced that res ipsa cases lend themselves to severe abuse findings since there is no way to prove whose acts caused the alleged serious physical injury and whether those acts were intention *1031 ally or recklessly perpetrated within circumstances evincing a depraved indifference to human life. To that end, the court has done an extensive statewide search for cases addressing severe abuse in family court res ipsa fact patterns. Case law in this area has yielded opposite results. The court found only three cases on point, two Appellate Division cases and one Family Court case. None of those cases emerged from the Second Department. As such, they are instructive, but not controlling here.
In Matter of Kayden E. (Luis E.) (88 AD3d 1205 [2011]), a Third Department case, the evidence demonstrated that the subject child’s injuries were life threatening and left her permanently physically and mentally damaged. (See Matter of Kayden E., 88 AD3d at 1206.) The proof also showed that the respondent mother and the respondent father were the only two individuals who had contact with the subject child during the time period that she sustained those injuries. (See id.) In Matter of Kayden E., the evidence established that the respondent father’s explanation for the subject child’s injuries was inconsistent with the expert testimony that determined that the subject child’s trauma was plausibly inflicted within 24 hours prior to her hospital admission, and was not accidental. (Id.) The Otsego County Family Court found, inter alia, that the subject child was severely abused. (Id. at 1206-1207.) Citing its deference to the Otsego County Family Court’s credibility determinations, the Third Department upheld that court’s severe abuse findings. (Id. at 1207.)
Conversely, in Matter of Child (25 Misc 3d 745 [Dec. 10, 2008]), a Washington County Family Court case from the same department, the proof demonstrated that the subject child was gravely ill, presenting with a panoply of injuries related to shaken baby syndrome. (See Matter of Child, 25 Misc 3d at 761.) The evidence showed that the trauma suffered was nonaccidental and had been inflicted within the week prior to the subject child’s hospital admission. (See id. at 762-764.) In Matter of Child, the court found that based upon the proof presented, it was more likely than not that during the early morning hours of January 31, 2008, the subject child suffered her injuries. (Id. at 764-765.) Thus, the Matter of Child court reasoned that using the preponderance of the evidence standard, the respondent mother abused and neglected the subject child by shaking her while the subject child was in her care. (Id.) By contrast, however, the Matter of Child court found that *1032 the evidence was insufficient for a severe abuse finding in light of its heightened clear and convincing evidence standard. (Id. at 765-767.) The Matter of Child court explained that where the standard of proof rises, so too must the strength of the evidence. (Id. at 766-767.) Since the evidence showed that the injuries could have occurred up to one week prior to the subject child’s hospital admission, and during that time frame, several individuals had contact with the subject child, the Matter of Child court declined to address the mens rea element of severe abuse and found that severe abuse did not lie. (Id. at 767.)
Finally, in Matter of Jezekiah R.-A. (Edwin R.-E.) (78 AD3d 1550 [Nov. 12, 2010]), a Fourth Department case, the evidence showed that the subject child’s injuries were consistent with shaken baby syndrome, and that some of those injuries were as old as several weeks. (See Matter of Jezekiah R.-A., 78 AD3d at 1550.) The proof demonstrated that the respondent father’s and respondent mother’s explanations for the subject child’s injuries were inconsistent with type and degree of the injuries the subject child suffered. (See id. at 1550-1551.) The Matter of Jezekiah R.-A. court found that since the subject child was in the care of the respondent father, the respondent mother, and his grandparents during the relevant time period, clear and convincing evidence that the respondent father intentionally or recklessly acted with a depraved indifference to human life could not be established. {Id.)
In the court’s view, the Third Department’s decision offers little guidance in its analysis of the issues and the Washington County Family Court’s decision from the same department, which remains unappealed, comports with the Fourth Department’s logic. The court finds the rationale of the Fourth Department’s decision persuasive and chooses to incorporate its reasoning into the court’s critique of the issues in the instant matter. Here, there is no question that child abuse caused Anniyah to sustain serious physical injury which led to her demise. The medical testimony and documentation presented is unequivocal. Notwithstanding, consistent with the very nature of a res ipsa case, the evidence in the case at bar did not show who committed those child abuse acts or what exactly happened to Anniyah to cause her trauma. Especially in light of the heightened standard of proof in a severe abuse case, the court cannot in good conscience enter a derivative severe abuse finding against the respondent mother. Since the evidence revealed that the respondent mother was not Anniyah’s only caretaker *1033 during the relevant time period, the petitioning agency’s evidence was not entirely satisfactory and did not create a genuine belief in the court that the respondent mother either intentionally or recklessly committed acts to Anniyah under circumstances evincing a depraved indifference to human life. Thus, the court declines to enter a derivative severe abuse finding against the respondent mother. Accordingly, the court dismisses those portions of the petitions in conformity with the reasoning set forth within this decision.
Adjudged, that the petitioning agency met its burden of proof as to every element of derivative neglect; and it is further, adjudged, that the petitioning agency met its burden of proof as to every element of derivative abuse; and it is further, adjudged, that the petitioning agency did not meet its burden of proof as to every element of derivative severe abuse; and it is further, adjudged, that the petitioning agency did not meet its burden of proof as to every element of derivative repeated abuse; and it is therefore, ordered, that a derivative neglect finding against the respondent mother is entered with respect to Amirah L., Anniyah L.’s surviving sibling; and it is further, ordered, that a derivative abuse finding against the respondent mother is entered with respect to Amirah L., Anniyah L.’s surviving sibling; and it is further, ordered, that the court declines to enter a derivative severe abuse finding against the respondent mother with respect to Amirah L., Anniyah L.’s surviving sibling, and dismisses those portions of the petitions in conformity with the reasoning set forth within this decision; and it is further, ordered, that the court declines to enter a derivative repeated abuse finding against the respondent mother with respect to Amirah L., Anniyah L.’s surviving sibling, and dismisses those portions of the petitions in conformity with the reasoning set forth within this decision; and it is further, ordered, that a forensic mental health examination of the respondent mother be prepared in connection with this case; and it is further, ordered, that an investigation and report be prepared in connection with this case; and it is therefore, ordered, that the parties are directed to appear on December 10, 2012 at 9:30 a.m. for a dispositional hearing in the matter.

. The court presides over one of two Queens County Family Court “trial parts,” which offer immediate trials, and were formulated to facilitate speedy resolutions in child protective cases.

. On November 10, 2011, in order to comport with the strictures of Judiciary Law § 21 and due process principles, the court granted the respondent mother’s and the respondent PLR’s motion for a mistrial. (See Judiciary Law § 21; see also NY Const, art I, § 6.)

. Since the respondent PLR chose not to stipulate that he was a person legally responsible for Amirah and Anniyah, and since the court was unable to enter a finding pursuant to section 1051 (a) without deeming the respondent PLR to be a person legally responsible for their care, the court bifurcated the trial and proceeded first against the respondent PLR on the limited issue of his legal status, if any, regarding Amirah and Anniyah. After the petitioning agency met its burden that the respondent PLR was, in fact, a person legally responsible for Amirah’s and Anniyah’s care, the respondent PLR submitted to the court’s jurisdiction, and the court entered an abuse finding against him.

. The court notes parenthetically that the respondent mother did not make a motion to dismiss at the close of the petitioning agency’s case.

. The court finds worthy of mention that the petitioning agency did not request that the court make findings regarding the petition’s perceptibly lesser included offenses.

. The Attorney for the Child’s summations supported an abuse and a neglect finding against the respondent mother. When the court questioned the Attorney for the Child about whether or not the Attorney for the Child supported a severe abuse and/or a repeated abuse finding against the respondent mother, the Attorney for the Child answered in the affirmative and elaborated.

. The court finds worthy of mention that in their closing arguments, the parties addressed “severe and repeated abuse” findings, not understanding that there is a distinction between “severe abuse” and “repeated abuse,” and that they are not one and the same. The court will speak to the meaning of these concepts hereinafter.

. The petitioning agency’s exhibits No. 1 and No. 2, ORTs, dated March 25, 2010, were admitted into evidence through Ms. Figueroa.

. The petitioning agency offered Dr. Hoffman-Rosenfeld’s curriculum vitae into evidence as petitioning agency’s exhibit No. 3, but the court declined to admit the document into evidence.

. During the course of the trial, the petitioning agency attempted, without success, to subpoena a certified and delegated copy of Anniyah’s autopsy report to offer into evidence.

. The respondent mother’s exhibit A, an employment letter, was admitted into evidence through the respondent mother.

. The respondent PLR in this case.

. The records indicate that a proper external examination of Anniyah could not be performed due to the urgent nature of Anniyah’s injuries. (Id.)

. “One who has no interest in the cause or matter in issue, and who is lawfully competent to testify.” (Black’s Law Dictionary 468 [6th ed 1990].)

. In any trial proceeding, the finder of fact, be it judge or jury, is charged with the responsibility of not just listening and accepting the answers that witnesses offer to questions, but must also weigh and consider the behavior and demeanor of those testifying. (See e.g. Matter of Taylor T. [Darren T.], 73 AD3d 1075, 1075 [2d Dept, May 18, 2010] [great deference afforded trial court who is in best position to assess the credibility of the witnesses and the evidence proffered]; Matter of Kai B., 38 AD3d 882, 883 [2d Dept, Mar. 27, 2007] [same]; Matter of Orange County Dept. of Social Servs., 215 AD2d 562, 563 [2d Dept 1995] [upholding trial court’s assessment of child’s credibility and affirming dismissal of abuse proceeding]; Matter of Thomas S., 26 AD3d 389, 389-390 [2d Dept, Feb. 14, 2006].) The court had the unique opportunity to observe the eye contact, body language, and inflection of each witness’s voice, and to contemplate those physical cues along with the other evidence in deciding whether or not the petitioning agency met its burden of proof.

. An abuse or neglect finding regarding a deceased child may be the basis for a derivative abuse finding or derivative neglect finding on behalf of that child’s surviving sibling. (See Matter of Child Welfare Admin. v Marsha C., 225 AD2d 766, 766 [2d Dept 1996] [affirming derivative abuse finding for decedent baby’s living sister where evidence showed father inflicted injuries on six-week-old son from which baby died; surviving sibling at risk of abuse].) In the instant case, the court finds that the respondent mother’s abuse and neglect of Anniyah is sufficient to justify findings of derivative abuse and derivative neglect on behalf of Amirah.

. The court notes parenthetically that, standing alone, the Social Services Law portion of the relevant section of the severe abuse definition appears not to contemplate a person legally responsible’s acts for the purposes of *1030 a severe abuse finding. (See Social Services Law § 384-b [8] [a] [i].) Thus, a court may not enter a severe abuse finding against a person legally responsible for a child’s care (Social Services Law § 384-b [8] [a] [i]; Matter of Leonardo V., Jr. [Leonardo V.], 90 AD3d 1343, 1345 [2d Dept, May 30, 2012] [affirming severe abuse finding regarding appellant’s biological child, but not for child to whom he was not parent; order modified]), but may enter a derivative severe abuse finding against a target child’s sibling’s parent where that parent was convicted of the target child’s murder or manslaughter during a time period where he or she was legally responsible for the target child’s care. (See Social Services Law § 384-b [8] [a] [iii] [A]; see also Matter of Yamillette G., 23 Misc 3d 841, 850-854 [Fam Ct, Kings County, Feb. 6, 2009].) Accordingly, by admission, submission, or even after trial, such a finding would have been inappropriate against the respondent PLR with respect to Amirah.